474 So.2d 1253 (1985)
W. Richard HOOPER, Appellant,
v.
BARNETT BANK OF WEST FLORIDA, Appellee.
No. AZ-395.
District Court of Appeal of Florida, First District.
September 5, 1985.
Rehearing Denied September 27, 1985.
*1254 Donald H. Partington and Robert D. Hart, Jr. of Clark, Partington, Hart, Hart & Johnson, Pensacola, for appellant.
Robert P. Gaines of Beggs & Lane, Pensacola, for appellee.
SMITH, Judge.
W. Richard Hooper, a physician, appeals judgments adverse to him in his action against the appellee bank. The trial court directed a verdict in favor of the bank at the close of all the evidence in Hooper's suit seeking cancellation of a promissory note to the bank in the sum of $90,000.00, and also entered a final judgment in favor of the bank on its counterclaim against Hooper for collection of the $90,000.00 note, plus interest, attorneys fees and costs. The loan by the bank to Hooper had been arranged by Joe G. Hosner, an attorney and customer of the bank. Dr. Hooper's suit was based on allegations that the bank had knowledge of fraudulent activity by Hosner, but failed to disclose this information to Dr. Hooper, and instead, made the loan knowing that a fraud was being perpetrated on Dr. Hooper. We reverse.
In reviewing the directed verdict, we are required to view the evidence in a light most favorable to Dr. Hooper. So viewed, the evidence shows the following: When Dr. Hooper moved to Pensacola in 1973 he began doing business with the bank. He appointed the bank trustee of a trust and personal representative of his estate. Several years later, Dr. Hooper became interested *1255 in making a tax shelter investment. In June 1981, he met with Hosner to discuss tax shelter investments. Hosner took him to see Edwin Riffel, the loan officer in charge of Hosner's accounts at the bank. Dr. Hooper testified that Riffel told him he was familiar with Hosner investments, and they were sound and had passed IRS scrutiny. Dr. Hooper decided to make a tax shelter investment with Hosner and borrowed $50,000.00 from the bank for the investment.
During the spring of 1982, Harry Stump, the assistant vice president at the bank who supervised the bookkeeping department, the proof department and the cash management department, became concerned at the rather large amount of uncollected funds in the Hosner Enterprises account. He also became suspicious that Hosner was involved in a check-kiting scheme. When the uncollected funds reached approximately $200,000.00 in the Hosner Enterprises account in early May, Stump met with Riffel on May 11 and conveyed his suspicions to Riffel. Riffel was aware of the large amount of uncollected funds in the Hosner Enterprises account and was additionally concerned because Hosner was delinquent in his loan payments. In fact, early in May, Riffel had told Hosner he had to get some money into his account. Also, by May 1982, Riffel knew that the IRS was investigating Hosner.[1]
In his deposition prior to trial, Stump had testified that he became personally convinced that Hosner was check-kiting around May 10, 1982. However, at the trial, he explained that his deposition testimony had been too hasty and that a more accurate description of his feelings on May 11 was that he was concerned about a check-kiting scheme, but the scheme was not confirmed because "you can't confirm that it is a kite until you start to put a stop to it."
On May 11, Stump instructed bank employees to make copies of the checks which were being deposited to the Hosner account and send the copies to him, and only then could the deposits be credited to Hosner's account. After this particular reporting procedure began, the uncollected funds activity on Hosner's account increased.
On May 14, Stump admitted, the situation had deteriorated to the point that Stump felt the bank was "at risk." In other words, the uncollected funds in the Hosner account were very great, so that if the bank continued to pay the checks presented on the account, it might be paying out money which was not in the bank, and which could not be collected, and the bank would lose money. In an effort to protect the bank, Stump made the decision to return all Hosner checks presented to the bank on May 13 on the grounds that they were being drawn against uncollected funds. A computer printout of bank transactions, which is reviewed daily by bank officers, was prepared on the evening of Friday, May 14. However, this printout would not ordinarily be reviewed by other bank officials until the next business day, which was Monday, May 17. Stump testified that May 17 was the first time other bank officials would have known that Hosner's checks were being returned on the basis of uncollected funds. Stump testified that after May 11 he did not discuss the Hosner situation with Riffel again until May 19 or 20.
The transaction giving rise to this litigation occurred as follows: Late in the afternoon of May 14, during a break from surgery, Dr. Hooper received a call from Hosner. *1256 He returned the call.[2] Hosner put Dr. Hooper on hold and then came back on the line with Riffel in a three-way conversation. Dr. Hooper asked to borrow $90,000.00 for purposes of investment. Riffel agreed to the loan. The conversation was very short and was ended when Dr. Hooper had to return to surgery. Late that evening, after banking hours, a promissory note prepared by Riffel and a check, representing the proceeds of the loan in the sum of $89,865.00, were delivered to Dr. Hooper for his signature by a messenger from Hosner's office. He signed the note and endorsed the check and these were returned to the messenger. A copy of this check for $89,865.00, introduced into evidence at the trial, shows that the back of the check is stamped "for deposit only, Hosner Enterprises, Inc., XXXXXXXXXX." Also introduced into evidence was a deposit slip dated May 17, depositing into the Hosner account a sum of money which included a check for $89,865.00.
Meanwhile, at about this same time, another bank in town, First American Bank, began refusing to pay Hosner's checks. On May 17, checks totaling $270,000.00 were returned to the appellee bank from First American Bank. On May 24, the Hosner Enterprises account had insufficient funds and the appellee bank had confirmed a check-kiting scheme. Nevertheless, by May 26, the account had been "zeroed out." At the conclusion of his testimony, Stump admitted that without deposit of Dr. Hooper's approximately $90,000.00 check, Hosner's account would have been overdrawn "$87,000.00 or something."
Dr. Hooper testified he never received any benefit from the $90,000.00 he gave to Hosner. Moreover, he testified that had he known of the IRS investigation, of the check-kiting scheme, of the fact that Barnett had refused to honor checks on the Hosner Enterprises' account to protect its position, that Hosner was at the bank because he was told he needed to get money to the bank to cover overdrafts and delinquent loans, he would not have made the loan. Riffel testified, as justification for his actions, that he did not disclose any information to Dr. Hooper concerning Hosner's account on May 14 because of the duty of confidentiality the bank owed to its depositor, Hosner.
At the conclusion of the plaintiff's evidence, the trial court reserved ruling on the bank's motion for directed verdict. However, the bank then announced that it would present no evidence, and renewed its motion, whereupon the trial court entered a directed verdict in favor of the bank.
Briefly, it is Dr. Hooper's contention that a confidential or fiduciary relationship existed between himself and the bank so as to impose upon the bank the duty to disclose the material facts relating to the loan transaction. First National Bank in Lenox v. Brown, 181 N.W.2d 178 (Iowa 1970). Alternatively, he contends that since the bank had actual knowledge of the fraud perpetrated on him by Hosner that it had an affirmative duty to disclose this knowledge before it made the $90,000.00 loan which furthered the fraud. Richfield Bank and Trust Co. v. Sjogren, 309 Minn. 362, 244 N.W.2d 648 (1976). On the other hand, the bank contends that in the absence of evidence that the bank knew Hosner was going to deposit the loan proceeds in one of the bank's accounts to cover his cash shortages at the bank or that the *1257 bank knew Hosner was irretrievably insolvent, the court correctly directed a verdict in favor of the bank. In that vein, the bank argues that Dr. Hooper's evidence did not establish facts sufficient to overcome the bank's obligation not to reveal confidential financial information about its depositor Hosner, Milohnich v. First National Bank of Miami Springs, 224 So.2d 759 (Fla. 3d DCA 1969), particularly in view of the fact that Dr. Hooper failed to request any information about Hosner's current financial affairs from Riffel.
We begin our resolution of this somewhat novel controversy by a review of relevant legal principles, noting, however, that we find little guidance in the Florida case law. Generally, a bank-depositor relationship is treated as a debtor-creditor relationship, and does not ordinarily impose a duty of disclosure upon the bank. Denison State Bank v. Madeira, 230 Kan. 684, 640 P.2d 1235 (1982); Klein v. First Edina National Bank, 293 Minn. 418, 196 N.W.2d 619 (1972); Annot., Existence of Fiduciary Relationship between Bank and Depositor or Customer so as to Impose Special Duty of Disclosure upon Bank, 70 A.L.R.3d 1344, 1347 (1976). However, there are circumstances in which a duty to disclose may arise: (1) one who speaks must say enough to prevent his words from misleading the other party; (2) one who has knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party; and (3) one who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts. Klein v. First Edina National Bank, supra. A duty to disclose may also arise under still another circumstance, that is, when the bank has actual knowledge of fraud. Richfield Bank and Trust Company v. Sjogren, supra. With regard to the fiduciary duty of disclosure, which Dr. Hooper urges is applicable here, the courts have recognized a duty to disclose the material facts of a transaction where a bank holds itself out as a financial advisor or otherwise has reason to know (has actual or constructive knowledge) that a depositor is reposing trust and confidence in the bank. Klein v. First Edina National Bank, supra; Annot., 70 A.L.R.3d 1344, 1347-1349.
In his brief, Dr. Hooper urges that the trial court erroneously granted the bank's motion for a directed verdict because only the jury, as the trier of fact, could determine what the bank knew, when it knew it, and whether the bank's knowledge of Hosner's fraudulent activities in this case was such as to require disclosure to Dr. Hooper.
In ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions, the motion must be denied and the matter submitted to the jury. Further, in ruling on a motion for directed verdict, the trial court should not pass on the credibility of witnesses or weigh the evidence, as this is the province of the jury. Townsend v. Ward, 429 So.2d 404 (Fla. 1st DCA 1983); American Motors Corp. v. Ellis, 403 So.2d 459 (Fla. 5th DCA 1981); Lundquist v. Alewine, 397 So.2d 1148 (Fla. 5th DCA 1981); and Reeder v. Edward M. Chadbourne, Inc., 338 So.2d 271 (Fla. 1st DCA 1976).
Although we are compelled to acknowledge that we are required to reach a decision based upon our review of a cold record, we nevertheless are of the opinion that the evidence below was subject to conflicting inferences concerning whether a confidential relationship existed between the parties and whether the bank had knowledge of material facts which it was required to disclose, under the governing legal standards, and that reasonable minds might well have reached differing conclusions on these issues. Accordingly, we are of the view that the trial court should have submitted these issues to the jury.
Although the determination of a confidential relationship may sometimes be *1258 a question of law for the court, Dale v. Jennings, 90 Fla. 234, 107 So. 175 (1925), when the facts and circumstances of the relationship are not conceded, it may become a mixed question of law and fact, in which case the fact issue should be submitted to the jury. Compare Lundquist v. Alewine, supra.
On the matter of the existence of a confidential relationship, the record reveals Dr. Hooper's uncontroverted testimony that when he made his investment with Hosner in June, 1981, Riffel told him that Hosner's investments were sound and had passed IRS scrutiny. Although Dr. Hooper did not ask Riffel any questions about Hosner on May 14, the date of the loan in question, we do not think this fact is determinative of the existence of a confidential relationship between the parties.[3] There still remains evidence which tends to show that Riffel at one point undertook to give Dr. Hooper financial advice concerning Hosner. When this evidence is considered along with all other evidence of the relationship between the parties, including the fact that the bank was appointed trustee of Dr. Hooper's trust and personal representative of his estate, the jury could reasonably have found that Dr. Hooper stood in a confidential relationship with the bank.
The question remains, however, whether the jury could find that the bank had knowledge of material facts concerning this transaction which it was under a duty to disclose to Dr. Hooper. We think so. Certainly, a jury question existed whether Riffel, having previously undertaken the role of advising Dr. Hooper of the financial feasibility of Hosner's investments, was under a duty to advise Dr. Hooper that his previous endorsement of Hosner's investments was no longer valid as Hosner was currently undergoing IRS investigation. We also conclude that the jury could have reasonably found that the bank had knowledge of additional facts which it was required to disclose. Specifically, the bank had knowledge on May 14 that it had ceased honoring checks on Hosner's accounts in order to protect itself from financial losses.[4] This self-protective action by the bank was not disclosed to Dr. Hooper. As noted, the loan was arranged by Hosner by means of a three-way, mid-surgery telephone conversation between Hosner, the bank and Dr. Hooper. In addition, the loan was consummated after the close of regular banking hours on Friday evening, with the aid of a messenger from Hosner's office, obviously with the knowledge and consent of the bank. This was not, a jury might reasonably conclude, a routine, armslength loan transaction, but one engineered by a bank customer known to be at least seriously delinquent, and very likely guilty of fraud in his dealings with the bank. Under the circumstances, a jury could reasonably conclude, we believe, that nothing would have prevented the bank from insisting, as a condition to approval of the Hosner-arranged loan to Dr. Hooper, that Hosner disclose to Dr. Hooper the status of his delinquent loans and overdrawn accounts with the bank. As a last alternative, the bank could have simply declined to make *1259 the loan.[5] We are persuaded that a jury could have reasonably inferred that on May 14 the bank knew that there was a substantial likelihood that the proceeds of the $90,000.00 loan to Hooper would be used by Hosner to cover Hosner's shortages at the bank, to the detriment of Dr. Hooper. As already indicated above, the evidence tended to show that the loan proceeds were deposited in Hosner's account. Also, as appellant urges, the evidence is subject to a fair inference that the bank ultimately benefited from this transaction, an inference which the bank vigorously denies. On this issue, as is true as to other facts and inferences for which we find support in the record, the bank may at trial be able to present evidence which will require a completely different view of the facts and inferences which must be drawn from them.
We are not unmindful that a bank has a duty not to disclose the financial condition of its customers. Peterson v. Idaho First National Bank, 83 Idaho 578, 367 P.2d 284 (1961); Annot., Banks Duty to Customer or Depositor not to Disclose Information as to his Financial Condition, 92 A.L.R.2d 900 (1963); Milohnich v. First National Bank of Miami Springs, supra. We are not suggesting a rule that would require a bank, each time it loans money to a customer for the benefit of another customer, to reveal facts concerning the questionable financial dealings or status of the other customer. However, in cases such as this, where a fiduciary duty to disclose may arise under the facts and circumstances, the jury is entitled to weigh this duty to disclose against the bank's duty of confidentiality to its depositors. See Tokarz v. Frontier Federal Savings and Loan Association, 33 Wash. App. 456, 656 P.2d 1089 (Wash. Ct. App. 1983). After a thorough review of the evidence, we find that the jury could have concluded that the bank's duty to disclose or to require disclosure by Hosner outweighed its duty to keep Hosner's affairs confidential.
Regarding appellant's second point on appeal, the trial court's exclusion of the substance of Hosner's telephone conversation with Dr. Hooper on May 14 (see footnote 2, supra), on grounds of hearsay, we conclude that the court's ruling was correct as to portions of the conversation, but incorrect as to others. We agree that the trial court properly excluded Dr. Hooper's proferred testimony that Hosner told him he had made the necessary arrangements for the loan with Riffel that day. We agree with appellee that if this statement was not offered to prove the truth of the fact stated by Hosner, it was irrelevant. If it was offered to prove the fact, it was hearsay. Section 90.801, Florida Statutes (1983), Florida Evidence Code. However, Dr. Hooper's proferred testimony as to other portions of the telephone conversation with Hosner was improperly excluded, since the proferred evidence was not offered to prove the truth of the facts stated by Hosner (i.e., that Dr. Hooper needed to borrow more money for his investment, and needed to do it that day), but instead, was properly offered and was relevant to prove that Dr. Hooper, in requesting a loan in his ensuing telephone conversation with Riffel, was acting on inducement by Hosner. Whether Dr. Hooper initiated the idea of a loan, or whether it was initiated by another, and for what purpose, are facts relevant to the basic loan transaction in issue, which Dr. Hooper would be entitled to explain to the jury, and would not be hearsay.
REVERSED and REMANDED for a new trial on all issues.
ZEHMER and BARFIELD, JJ., concur.
NOTES
[1] Although Dr. Hooper alleged in his complaint that Mr. Riffel knew that IRS was conducting a criminal investigation of Hosner at this time, the bank denied this allegation. At the trial, when Mr. Riffel was asked whether he knew Hosner was being investigated by the IRS for criminal tax fraud, he responded evasively, "I knew that he was being investigated." We are of the view that Riffel's failure to categorically deny knowledge that the investigation was for criminal tax fraud might fairly be interpreted by a jury as implying the existence of such knowledge.
[2] At the trial, Dr. Hooper attempted to testify concerning what Hosner told him in this telephone conversation, but the bank objected on the grounds of hearsay and the objection was sustained. Dr. Hooper proffered his testimony that Hosner told him that he (Dr. Hooper) needed to borrow more money for his (Dr. Hooper's) investment, that he had to do it that day, and that he, Hosner, had made the necessary arrangements with Riffel at the bank. Riffel, who was called to testify during Hooper's case in chief, testified that Hosner had not talked to him about the loan in advance of Riffel's conversation with Dr. Hooper, and that when he asked Dr. Hooper what he was going to do with the money, Dr. Hooper told him he was going to use it for an investment. Riffel assumed the money was going for one of Hosner's tax shelter investments.
[3] In so stating we are not unmindful of the following authorities: "Banks are under no duty at law to warn the investing public as to the financial condition of their depositors." Cunningham v. Merchants' Nat. Bank, 4 F.2d 25 (1st Cir.1925), cert. den., 268 U.S. 691, 45 S.Ct. 511, 69 L.Ed. 1160 (1925). A party failing to ask the bank questions concerning the financial consequences of a transaction may be precluded from imposing a duty to disclose and instead, the bank's duty not to disclose the financial condition of a depositor will prevail. Peoples Bank of the Virgin Islands v. Figueroa, 559 F.2d 914 (3d Cir.1977). We simply conclude that under the facts and circumstances of this case, Dr. Hooper's failure to ask questions on May 14 does not in itself preclude a finding of a confidential relationship between the parties.
[4] The bank argues that since Stump did not tell Riffel that he had ordered Hosner's checks returned that the bank cannot be charged with this knowledge on May 14. This argument ignores the rule that Stump's knowledge on May 14 is imputed to the bank. 10 Am.Jur.2d, Banks, § 163, et seq., p. 153; 5 Fla.Jur.2d, Banks and Lending Institutions, § 91, p. 222; Richfield Bank and Trust Company v. Sjogren, 244 N.W.2d at 652, n. 1.
[5] As recognized in Richfield Bank and Trust Company v. Sjogren, 244 N.W.2d at 652, n. 2, when disclosing facts may constitute a breach of the bank's duty to its depositors not to disclose confidential information, the bank has the option to refuse to make the loan.