642 So.2d 788 (1994)
DEPARTMENT OF TRANSPORTATION, State of Florida, Appellant,
v.
Dawn Ann SPIOCH; Kimberly A. Ziegler, a minor, by James B. Ziegler and Jane Ziegler as the parents and natural guardians and James B. Ziegler and Jane Ziegler, individually, Appellees.
No. 92-2551.
District Court of Appeal of Florida, First District.
Decided September 14, 1994.
*789 Thornton J. Williams, Gen. Counsel, and Thomas F. Capshew, Asst. Gen. Counsel, Florida Dept. of Transp., Tallahassee, for appellant.
Steve M. Watkins, III, of Law Offices of Thayer M. Marts, Tallahassee, for appellees.
ZEHMER, Chief Judge.
In this negligence action arising out of the collapse of a bridge maintained by the Department of Transportation, the Department brings this appeal from the final judgment entered on a jury verdict in favor of Plaintiffs/Appellees, Dawn Ann Spioch and Kimberly A. Ziegler. The Department argues that Plaintiffs have not shown either that the Department breached its duty to inspect and maintain the bridge in question, or that the alleged breach of such duty was the proximate cause of Plaintiffs' injuries. We affirm.

I.
This cause of action arose out of the sudden collapse of Bridge Number 500026 over Bear Creek on State Road 267 south of Quincy, Florida. In the early evening of August 5, 1987, Plaintiffs Dawn Ann Spioch and her 12-year-old niece, Kimberly Ziegler, were riding Spioch's motorcycle north on State Road 267. Neither Spioch nor Ziegler remembers the occurrence of the accident; however, Alfred Suber and his son were following Spioch and Ziegler in their pickup truck and witnessed the incident. Both testified that they were following the motorcycle at a safe distance when it "just disappeared." Neither Suber nor his son saw the hole in the road before the motorcycle disappeared. Suber testified the road was still crumbling in as he stopped his pickup truck. Spioch and Ziegler sustained permanent injuries.
Although the Department did not have plans showing the bridge's construction, the evidence indicated that it was a barrel-type structure supported by untreated yellow poplar pilings topped by concrete footers.[1] As required by section 335.074(2), Florida Statutes, the Department had inspected the bridge in 1983, 1985, and on June 2, 1987, approximately two months before the collapse. The reports filed in 1983 and 1985 showed undermining of pier three and block-age at the outfall end of barrel three, and recommended that concrete rubble be placed across barrels two and three. It was later revealed in the June 1987 report that rubble was in fact found at the outfall of barrels one and three, and not at the outfall of barrel two. According to the evidence, concrete rubble was placed in the creek bed to facilitate the deposit of sand to support the structure; it was also revealed that in 1987, an examination of the first barrel showed the footers were "sanded up." At that time, the stream of water was flowing only through barrel three. John B. Locke, an engineer with the Department having responsibility for managing and administering the district's bridge inspection program, testified that the 1987 inspectors probably should have dug a hole to determine if rubble had indeed been placed in front of barrel two.
The Department's experts investigated the collapse and reviewed the bridge records. They opined that the bridge collapse was caused by the undermining of footer number two located at the south end of the bridge and the consequent severing of the pilings beneath that footer. They further opined that the failure was caused by scour damage to the structure from a "200-year" flood in 1969, as well as by a subsequent similar major event in 1974. The damage was ultimately hidden by sand, which had redeposited over the footer and created an "unseen void" where abrasion and decay had eroded the pilings supporting the footer. Nevertheless, John Goddin, a bridge inspector with the Department, personally inspected the bridge on June 2, 1987, and gave the bridge a rating of 7 on a scale of 1 to 9 (9 being the highest and best rating). He admitted, however, that although the bridge inspection manual requires that the report should specifically *790 indicate that a specific component of the bridge cannot be inspected, he did not mention in his 1987 report the fact that he did not inspect the pilings on the south end of the bridge. He also admitted that bridge pilings are considered under the manual to be a component of the bridge and that he should have checked to see if there were any pilings under the footers and whether they were worn.
Larry Sessions, an engineer with the Department and a quality assurance inspector, also testified that the pilings are components of the bridge. He stated that the inspector must inspect the components of the bridge, and if that cannot be accomplished, mention of that fact must be made in the report. Sessions further testified that the undermining of a footer would be a deficiency that should have been noted in the 1985 and 1987 inspection reports, and that scouring and abrasion of pilings is to be expected in the event of an undermined footer, warranting inspection of the pilings. The record contains several references to observations of scouring and erosion of pilings under one of the footers of the bridge, and that some of the footers were visible and more easily inspected.
Spioch and Ziegler sued the Department and Talquin Electric for negligence.[2] The complaint, in multiple counts, alleged essentially that the Department negligently breached its duty to Plaintiffs by failing to properly inspect and maintain Bear Creek Bridge, and that such negligence was the cause of their injuries. The Department's answer admitted that Spioch and Ziegler were involved in the accident, but denied any liability for it and asserted that the complaint failed to allege any facts showing that it had breached either a common law or a statutory duty owed to Plaintiffs. Approximately one year after filing the complaint, the Department moved for summary judgment, and in support thereof filed the affidavit of John Locke. Attached to Locke's affidavit was a copy of the bridge inspection report made by the Department's employee less than two months before the bridge collapsed. Locke asserted in his affidavit that the report complied with statutory requirements, and that he had reviewed and studied the records and files of the Department for the subject bridge and found nothing therein to give the Department prior warning of the bridge failure. He simply characterized the collapse as "an unusual, extraordinary or bizarre circumstance." The trial court denied the motion.
The case was tried before a jury. The Department's motions for directed verdict, made at the close of Plaintiffs' case and renewed at the close of all the evidence, were denied. Following deliberations, the jury returned a verdict against the Department in favor of Spioch and Ziegler. After the jury was polled, the Department moved for a judgment notwithstanding the verdict, which the trial court denied. On appeal, the Department asserts error in the trial court's denial of its motions for summary judgment, directed verdict, and judgment notwithstanding the verdict.

II.
Addressing first the denial of the motion for summary judgment, at the time of that hearing the record contained the complaint, the Department's answer and counterclaim, the Department's motion, John Locke's affidavit with the attached 1987 bridge inspection report, the Department's memorandum in support of its motion, Plaintiffs' memorandum in opposition to the motion, and the Department's rebuttal response to Plaintiffs' memorandum. Relying solely on Locke's affidavit, the Department argued that there was no genuine issue of material fact with regard to its alleged breach of duty to Spioch and Ziegler, in that it had breached neither its duty to properly inspect nor its duty to properly maintain the bridge. No other evidence was before the court at the hearing.
We agree with the trial court's ruling that Locke's affidavit was not sufficient to require entry of summary judgment for the Department. The affidavit does not contain any explanation as to the cause of the collapse, or otherwise set forth any facts showing that the Department was not in any way negligent *791 in its maintenance and inspection of the bridge. Nothing before the court at that hearing conclusively demonstrated that the Department had fulfilled its duty to exercise reasonable care in the inspection and maintenance of the bridge; thus, the Department failed to conclusively repudiate the allegations of the complaint.
Section 335.074, Florida Statutes, charges the Department with the responsibility for inspecting bridges at regular intervals not to exceed two years. Subsection (2) of that statute requires that the "thoroughness with which bridges are to be inspected shall depend on such factors as age, traffic characteristics, state of maintenance, and known deficiencies." The obvious purpose of this inspection requirement is to discover and repair dangerous conditions in the bridges of this state to protect the traveling public from potential injury due to a bridge collapse. This duty is ministerial in nature, similar to other aspects of road maintenance in general, and the Department does not contend otherwise. Hence, the Department owed a duty to the Plaintiffs in this case to conduct inspections of the bridge in question with due care and to exercise due care in maintaining the bridge and repairing any existing dangerous conditions of which it knew or should have known. Plaintiffs alleged that the Department breached both duties in that the Department negligently made inspections, and negligently failed to repair dangerous conditions which the Department knew or should have known existed in the bridge support structure, as a consequence of which the bridge collapsed causing injury to the Plaintiffs.
The rule in this state governing motions for summary judgment is that "the burden to prove the non-existence of genuine triable issues is on the moving party... ." Holl v. Talcott, 191 So.2d 40, 43 (Fla. 1966). The party against whom summary judgment is sought, however, is not always required to file a counteraffidavit to defeat the motion. Graff v. McNeil, 322 So.2d 40 (Fla. 1st DCA 1975). "If the pleadings, depositions, answers to interrogatories, admissions, affidavits and other evidence in the file raise the slightest doubt upon any issue of material fact then a summary judgment may not be entered." Connell v. Sledge, 306 So.2d 194, 196 (Fla. 1st DCA 1975), cert. dismissed, 336 So.2d 105 (Fla. 1976). In other words, the movant must carry the burden of negating the existence of any basis of liability asserted against it; the plaintiff is not required to prove its case in response to a motion for summary judgment.
In the instant case, the Department did not contest the fact that the bridge collapsed as the Plaintiffs rode onto it, nor that they suffered severe injuries as a result of the collapse. Rather, the Department argued that it breached no duty to the Plaintiffs, and that nothing it failed to do proximately caused the collapse. But the averments contained in Locke's affidavit were essentially self-serving conclusions that did not conclusively establish the nonexistence of material facts that would show the Department was negligent, either in making the statutorily required inspections, or in maintaining and repairing the bridge to correct a dangerous condition that the Department knew or should have known existed. As was true with the affidavits involved in Holl v. Talcott, the affidavit herein constituted "little more than a plea of not guilty," 191 So.2d at 45, for it essentially stated only that the Department acted in accordance with accepted standards of practice without showing what the Department actually did. Indeed, as Plaintiffs argue, the Locke affidavit left open more issues of material fact than it purported to negate. For example, obvious issues remaining to be resolved, despite the allegations in the affidavit, included what steps the Department actually had taken during, not only the referenced inspection, but prior inspections to insure that the bridge supports had been adequately examined to determine whether any of the components were defective and in danger of collapsing. The affidavit set forth no evidentiary facts showing how or why the bridge collapsed, or that the specific cause of the collapse was not discoverable through a properly conducted inspection; nor did it set forth any other facts showing what the Department had done to discover and rectify the dangerous condition that caused the collapse, relying instead on the simple characterization *792 that the occurrence was an "unusual, extraordinary or bizarre circumstance." For these reasons, we hold that the trial court correctly denied the Department's motion for summary judgment. See Galloway v. Law Offices of Merkle, Bright and Sullivan, P.A., 596 So.2d 1205 (Fla. 4th DCA 1992); Williams v. McNeil, 442 So.2d 269 (Fla. 1st DCA 1983).

III.
The Department's remaining points challenge the trial court's denial of its motions for directed verdict and for judgment notwithstanding the verdict. The following principles governed the trial court's consideration of the motions.
In ruling on a motion for directed verdict, the trial court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions, the motion must be denied and the matter submitted to the jury. Further, in ruling on a motion for directed verdict, the trial court should not pass on the credibility of witnesses or weigh the evidence, as this is the province of the jury.
Hooper v. Barnett Bank of West Florida, 474 So.2d 1253, 1257 (Fla. 1st DCA 1985), approved, 498 So.2d 923 (Fla. 1986). See also American Motors Corp. v. Ellis, 403 So.2d 459 (Fla. 5th DCA 1981), rev. denied, 415 So.2d 1359 (Fla. 1982); Lundquist v. Alewine, 397 So.2d 1148 (Fla. 5th DCA 1981); Reeder v. Edward M. Chadbourne, Inc., 338 So.2d 271 (Fla. 1st DCA 1976). Furthermore,
unless the evidence as a whole, with all reasonable deductions to be drawn therefrom, points to but one possible conclusion, the trial judge is not warranted in withdrawing the case from the jury and substituting his evaluation of the evidence for theirs.
Sheehan v. Frith, 138 So.2d 76, 78 (Fla. 3d DCA 1962). As to the Department's motion for judgment notwithstanding the verdict, "[t]he rules governing motions for judgments notwithstanding the verdict are substantially the same as those which guide the disposition of a motion for directed verdict." Stirling v. Sapp, 229 So.2d 850, 852 (Fla. 1969).
Motions for judgment notwithstanding verdict, like motions for directed verdict, should be resolved with extreme caution since the granting thereof holds that one side of the case is essentially devoid of probative evidence. The trial judge is authorized to grant such motion only if there is no evidence or reasonable inferences to support the opposing position.
Id. (Emphasis in original.) In view of the similar standards governing these motions, we discuss them collectively. Moreover, as the supreme court reminded us in McCain v. Florida Power Corporation, 593 So.2d 500 (Fla. 1992), "[t]he law in Florida is clear that, once the motion for directed verdict is overruled and additional evidence is produced, any later review of the matter by the trial or appellate courts must take into account all the facts adduced both before and after the initial motion." Id. at 502. (Emphasis in original.) Hence, we must examine the entire record to determine whether the proof was sufficient to warrant denial of the Department's motions.
The existence and scope of the Department's duty of care owed to the Plaintiffs under the circumstances of this case has already been noted. The issue of proximate cause is governed by the supreme court's recent opinion in McCain, wherein the court explained:
In the past, we have said that harm is "proximate" in a legal sense if prudent human foresight would lead one to expect that similar harm is likely to be substantially caused by the specific act or omission in question. In other words, human experience teaches that the same harm can be expected to recur if the same act or omission is repeated in a similar context.[3]... .
[3] Obviously, there is no requirement that the harm must recur every time, only that recurrence is likely.
However, as the Restatement (Second) of Torts has noted, it is immaterial that the defendant could not foresee the precise manner in which the injury occurred or its exact extent... . . In such instances, the *793 true extent of the liability would remain questions for the jury to decide.
... .
Unlike the "duty" context, the question of foreseeability as it relates to proximate causation generally must be left to the fact-finder to resolve. Thus, where reasonable persons could differ as to whether the facts establish proximate causation  i.e., whether the specific injury was genuinely foreseeable or merely an improbable freak  then the resolution of the issue must be left to the fact-finder.
Id. at 503-04. (Citations omitted.)
The record contains uncontroverted testimony of two lay witnesses who had observed a loose, "eroded" piling under one of the footers prior to the bridge collapse. Also in the record is a Departmental report which recites that the cause of the bridge collapse was the failure of the pilings and footers at pier number two. John Goddin, who inspected the bridge two months before the collapse, testified that the maintenance work which had been previously recommended for the bridge was either not done as recommended, or he could not recall whether it had been done. Goddin also testified that he had not felt there was any problem with the undermined footer when he inspected it in 1987, even though, acting as assistant inspector in 1983, this same fact was noted as a deficiency. Goddin further admitted that he should have inspected the pilings during the 1987 inspection; that he did not follow the requirements in the bridge inspection manual that all components (including pilings) must be inspected, and failed to note this omission in the report; that two differing bridge diagrams were initialed by him showing two inconsistent bridge profiles, and that these drawings did not correctly reflect the actual profile of the creek and bridge; and, that he had not taken any measurements of the undermining of one of the footers which he did observe, although this is customary, standard procedure. At this point in his testimony, Goddin explained that he had been "mistaken" in an earlier deposition wherein he had testified that during the 1987 inspection he could see underneath the footer, and that he had put his arm underwater to feel for pilings, but did not find any. At trial he denied that he had done this during the June 1987 inspection, but conceded he had testified to the contrary on deposition. Moreover, even though Goddin knew the entire footer was exposed underwater and that a previous report had indicated wing wall cracks (a noted deficiency which at times indicates settlement and substructure problems), Goddin admitted he did not call for an underwater inspection by others, which he concedes he could have done, and that he did not cause any inspection of the pilings by excavation or otherwise.
The testimony of John Locke and Larry Sessions, as well as other evidence of record, further supported Plaintiffs' case. Sessions agreed that pilings are considered components of the bridge and that the bridge inspection manual does not limit inspection to only the portions of components that are entirely visible to the eye. Rather, he confirmed that all components must be inspected and if not, the reason why must be noted in the report. Sessions further testified that he had not reviewed any reports to determine whether or not the instant bridge was designed to allow water to flow underneath the footings, and agreed that it would have been reasonable, when water was in fact seen to be running swiftly underneath the footings, to inspect for scouring and abrasion. In addition to Sessions' testimony, Locke stated he could not explain why the request in the 1985 report for rubble at the outfall end of barrel two was not mentioned in the 1987 report.
The Department argues that the bridge collapse was due to the severing of pilings under the second footer, and that this footer had nothing to do with barrel three where the scouring and abrasion had been visually observed without excavation of the footings. The Department also argues that the record contains uncontroverted evidence showing that it was required to conduct visual inspections only; that such inspections did not include excavations under footings which might otherwise compromise the integrity of the structure; and that the Department complied with the reasonable standard of care it had established for maintaining bridges. We *794 conclude that the record does not support these arguments.
While the evidence at trial indicated that the individual inspectors on site had discretion to determine the extent of the examination to be performed in making each bridge inspection, including whether to look beyond what was plainly visible to the eye without excavation or underwater examination, it was also made clear by the evidence that this discretion was to be exercised within the perimeters of required practices. Thus, the Department's experts were specifically asked whether they should have inspected the pilings to see if there were any signs of scouring or abrasion in view of the fact that the inspector observed water flowing underneath some of the footers, and they unanimously responded that it would have been a reasonable thing to do. Those experts also testified that scouring and abrasion of pilings can be expected in the event of an undermined footer, and that the pilings should be inspected when they are accessible and in three feet of water, as in this case. Indeed, the Department's own explanation of the collapse was that scour damage to the pilings under footer two occurred during a "200-year" flood in 1969 and a "similar" event in 1974, and that this damage was ultimately hidden by the accumulation of sand which had redeposited over the footer and created an "unseen void" where abrasion and decay had eroded the pilings. This explanation supports the reasonable conclusion that a defective condition of the pilings probably had existed for many years, during which a number of statutorily required inspections had been performed by the Department without investigation of the bridge pilings to determine whether the known "unusual" storm events had caused damage to the pilings. We cannot conceive that the Department's statutory duty to inspect the bridges on the roads of this state does not contemplate that the Department must check the bridge foundation structure such as pilings and footers, especially after gaining knowledge of unusual storm events such as that described in the Department's explanation, to insure that the structure is safe for use by the traveling public.
The supreme court has made abundantly clear that:
"It is ordinarily the function of the jury to weigh and evaluate the evidence. This is particularly so in negligence cases where reasonable men often draw varied conclusions from the same evidence."
Stirling v. Sapp, 229 So.2d at 852, quoting from Nelson v. Ziegler, 89 So.2d 780 (Fla. 1956). Having found that defective conditions existed under barrel 3, the jury was clearly entitled to conclude that the Department had a duty to inspect the components of the other two barrels utilizing all of the inspection methods to which the expert witnesses referred, including excavation of the pilings, and that the Department breached that duty in failing to do so. Considering the evidence in the record as a whole, and resolving all proof and inferences in favor of Plaintiffs, we cannot say that the evidence as a whole points to but one possible conclusion that requires entry of judgment for the Department as a matter of law. On the contrary, the trial court correctly submitted the issues of the Department's breach of duty and proximate cause to the jury.
AFFIRMED.
ALLEN, J., concurs.
WEBSTER, J., dissents with written opinion.
WEBSTER, Judge, dissenting.
After a careful reading of the entire record in this case, I am unable to agree with either the majority's characterization of the evidence or its conclusions. Accordingly, I am constrained to dissent.
In order to understand this case, it is first necessary to understand the configuration of the bridge, the collapse of which resulted in appellees' injuries. The bridge was what is known as a 3-barrel, structural plate arch (or steel culvert) bridge. In essence, the roadway was constructed upon three arches (or barrels) made of steel plates. The steelplate arches rested upon four concrete footings (or platforms)  one at each bank of the stream, and two at intervals in the streambed  which, in turn, rested upon sets of wooden pilings driven into the ground. It *795 is undisputed that the collapse was caused by decay and abrasion of two of ten pilings which supported the right-hand side of footing number 2 (the more southerly of the two footings actually within the streambed).
During presentation of their case, appellees offered no expert testimony regarding either the appropriate inspection procedures for a bridge such as the one that collapsed or whether any tests not conducted would have more likely than not resulted in discovery of the problem which caused the collapse. Instead, they relied upon the following: the report prepared by the Department as a result of its investigation after the collapse; the 1983, 1985 and 1987 bridge inspection reports; the Department's bridge inspection manual; the testimony of John Goddin, who had participated in the 1983 and 1987 inspections; and the testimony of two lay witnesses (Mr. and Mrs. Williams) who claimed to have seen a "loose" or "eroded" piling under one of the footings sometime before the collapse. After its motion for a directed verdict made at the close of appellees' case had been denied, the Department presented the testimony of Larry Sessions and John Locke, both of whom were tendered as experts.
My reading of the record leads me to conclude that the evidence establishes without dispute that the visible degradation (washing out) to which the majority makes repeated reference occurred at footing number 3, not at footing number 2 (under which the problem leading to the collapse developed). All of the evidence is to the effect that, at every inspection, footing number 2 was covered with sand. Moreover, neither Mr. nor Mrs. Williams, who claimed to have seen a "loose" or "eroded" piling under one of the footings, was able to place their discovery before the 1987 inspection. Rather, both conceded that they might have made their discovery between the date of the inspection and the date of the collapse. Both also conceded that, while they were unable to identify under which footing they had seen the piling, it had been under either footing number 3 or footing number 4. (There is nothing to suggest that either Mr. or Mrs. Williams reported their discovery to anyone.)
My reading of the record leads me to conclude, further, that the undisputed evidence is to the effect that the Department manual for bridge inspections was intended to require only visual inspection, and that further investigation or testing, including excavation, is appropriate only when, upon visual inspection, something is observed suggesting the need therefor. I am unable to find any evidence indicating that anything observed during any of the inspections suggested the need for further investigation or testing that was not performed. To the contrary, Messrs. Sessions and Locke, who were the only experts to offer opinions on the sufficiency of the inspections, both opined that the inspections had been properly performed.
My reading of the record also leads me to conclude that the undisputed evidence establishes that neither the cracks in the wing walls, nor the possible failure to place rubble at the outfall of barrel two nor the degradation at footing number 3 had anything whatsoever to do with the collapse. In fact, Messrs. Sessions and Locke both indicated that none of those problems suggested the possibility that the bridge might collapse.
I do not understand why a defendant should be held to have waived the right to appellate review of denial of a motion for a directed verdict made at the close of the plaintiff's case by electing to present evidence after the motion has been denied. It seems to me that such a rule presents defendants with nothing more than a Hobson's choice, and encourages the denial of such motions, regardless of merit, by trial judges. However, I acknowledge that to be the law in Florida. E.g., McCain v. Florida Power Corp., 593 So.2d 500 (Fla. 1992) (once a motion for directed verdict made at the close of plaintiff's case has been denied and additional evidence presented, any subsequent review of the sufficiency of the evidence must consider all evidence). I am aware, also, that motions for directed verdict (or judgment notwithstanding the verdict) should be granted with extreme caution, and only when, viewed in a light most favorable to the non-moving party, all of the evidence and inferences reasonably to be drawn therefrom establish conclusively that the *796 non-moving party is not entitled to prevail. E.g., Hendricks v. Dailey, 208 So.2d 101 (Fla. 1968). Notwithstanding these rules of law, based upon my reading of the record, I find myself obliged to conclude that the trial court should have granted the Department's motion for a judgment notwithstanding the verdict.
I am unable to find anywhere in the record any evidence regarding what it is, precisely, that the Department did that it should not have done, or did not do that it should have done. In other words, I find nothing in the record to suggest what duty the Department owed to appellees that it improperly performed, or failed to perform. Likewise, I find no express statement in the majority's opinion regarding that duty. Clearly, the majority believes that something more should have been done to investigate the integrity of the pilings under footing number 2; and it implies that that something more should have involved some sort of excavation. However, as I read the record all of the evidence is to the effect that the inspections were properly performed, and that nothing suggested the need for further investigation or testing. Moreover, I am unable to find in the record any evidence regarding either the need for excavation, or the type of test that might have been performed upon excavation. In addition, I find nothing in the record to support an inference that, had further tests been performed, the two problem pilings would have been discovered and the collapse averted. Accordingly, it seems to me that appellees established neither the breach of any duty by the Department nor proximate causation. Therefore, I would reverse, and remand with directions that the trial court enter judgment in favor of the Department. Because the majority affirms; and because I believe that such a result will require unreasonably expensive, utterly impracticable and wholly unnecessary inspections of every bridge in the state; respectfully, I dissent.
NOTES
[1] The bridge was built in 1938 by the WPA and opened to traffic in 1940.
[2] A final summary judgment was entered in favor of Talquin Electric.