937 P.2d 341

**Stanley KESSELMAN, as Trustee of the Gilbert & Sullivan Mortgage Company, Inc. Profit Sharing Plan; ArMA Membership Benefits, Inc., as Custodian, FBO Daniel N. Karsh, M.D. IRA Rollover; ArMA Membership Benefits, Inc., as Custodian, FBO Thomas E. Newman, M.D. IRA Rollover; Martin Rosenthal, as Trustee of the Martin G. Rosenthal, M.D., P.C. Profit Sharing Plan; and Phyllis Reuss, as Trustee Of The Phyllis S. Reuss, M.D., P.C. Employees' Retirement Plan, and as Trustee of the Phyllis S. Reuss, M.D. Family Trust, Plaintiffs–Appellants,**

v.

**THE NATIONAL BANK OF ARIZONA, a National banking institution, Defendant–Appellee.**

**No. 1 CA–CV 95–0551.**

Court of Appeals of Arizona, Division 1, Department C.

Oct. 22, 1996.

Review Denied May 20, 1997.*

---

* Feldman, J., of the Supreme Court, recused himself and did not participate in the determination of this matter.

Galbut & Conant by Martin R. Galbut and Paul A. Conant, Phoenix, for Plaintiffs–Appellants.

Snell & Wilmer by Lonnie J. Williams, Jr. and Lisa M. Coulter, Phoenix, for Defendants–Appellees.

## OPINION

KLEINSCHMIDT, Judge.

The plaintiffs, a group of private investors to whom we will refer as "the Lenders," appeal an order granting summary judgment against them in favor of National Bank of Arizona. The issue is whether a bank has a duty to disclose information about its customer's account to persons—in this case to the Lenders—with whom the customer does business. We hold that the Bank does not have such a duty, and we affirm the order granting the motion for summary judgment against the investors.

We consider the facts in the light most favorable to the parties opposing summary judgment. *Indian Village Shopping Ctr. Inv. Co. v. Kroger Co.*, 175 Ariz. 122, 854 P.2d 155 (App.1993). In 1993, Buddy Wood, a principal of Lucido–Wood Development Company, Inc., sought financing from National Bank of Arizona for a real estate project known as Castle Rock Condominium Development. Sandy Murphy, a loan officer at National Bank, informed Wood that the Bank would not finance the project but referred him to several mortgage lenders that might be interested in doing so, one of which was Gilbert & Sullivan Mortgage Company, Inc.

Wood contacted Gilbert & Sullivan, which is owned and operated by Scott Claypool. After meeting with Wood, Claypool contacted Murphy at National Bank to thank her for the referral and to inquire about Lucido–Wood's credit history. Murphy told Claypool that National Bank had done a little checking on one connection and that it had "checked out." Gilbert & Sullivan then assembled the Lenders to provide financing for the Castle Rock project. Claypool had periodic contact with Murphy regarding Gilbert & Sullivan's financing and on one occasion sought her opinion about Lucido–Wood's construction budget.

Eventually, the Lenders loaned $311,740 to Lucido–Wood. This loan closed in August 1993. A second loan of $210,060 was sched-

uled to close in October 1993, but never did. Escrow services for both loans were handled by Charter Title Agency, Inc. Claypool directed Charter Title to deposit the proceeds from these two loans at National Bank, apparently as a token of appreciation for the referral.

Charter Title maintained numerous accounts at National Bank, including its main escrow account. It was Charter Title's procedure to hold customers' money in its main account until it was time to disburse the funds.

As early as April 1993, National Bank suspected Charter Title of kiting checks. Check kiting is "[t]he wrongful practice of taking advantage of ... the time that elapses between the deposit of a check in one bank and its collection at another ... [A check kiter] uses funds which are not his by drawing checks against deposits which have not yet cleared through the banks...." He writes a check against a bank account which has insufficient funds to cover it, hoping that before it is presented the necessary funds will have been deposited. *See* BLACK'S LAW DICTIONARY 871 (6th ed. 1990).

From January to October 1993, Charter Title had twenty-one overdrafts in one account at National Bank totalling more than $7.3 million. The Bank did nothing to stop the kiting, but in October 1993, the Arizona State Banking Department froze all of Charter Title's assets, including its accounts at National Bank. As a result, most of the proceeds from the Lenders' first two loans were unavailable to Lucido–Wood. The Lenders provided a third loan to Lucido–Wood in the amount of $174,323.18 so that the real estate project could continue. After the third loan was extended, Lucido–Wood filed for bankruptcy and defaulted on the loans, claiming that the receivership undermined the project.

The receiver eventually released to the Lenders the principal of their loans. The Lenders claim their losses include lost interest, collateral litigation expenses, attorney's fees, foreclosure fees on the Castle Rock project and lost opportunity costs. The Lenders sued to recover total losses of over $440,000. The Bank successfully moved for summary judgment.

The trial court concluded that National Bank owed no duty to disclose irregularities detected in a fiduciary account to third-party beneficiaries. Summary judgment is appropriate if the court correctly decided that National Bank owed no duty to disclose, as negligence actions may be maintained only if there is a breach of a duty recognized by law. *Markowitz v. Arizona Parks Bd.*, 146 Ariz. 352, 354, 706 P.2d 364, 366 (1985). The question of duty is properly determined by the court as a matter of law. *Id.*

■ Generally, banks have a duty to their "customers not to disclose the customers' financial conditions to third parties." *R.A. Peck, Inc. v. Liberty Fed. Sav. Bank,* 108 N.M. 84, 766 P.2d 928, 933 (App.1988). A bank has no duty to third parties to disclose information about a customer's account. *See Eubanks v. F.D.I.C.,* 977 F.2d 166, 170 n. 3 (5th Cir.1992) ("banks ordinarily owe no duty, fiduciary or otherwise, to third person"); *Cumis Ins. Soc., Inc. v. Windsor Bank & Trust Co.,* 736 F.Supp. 1226 (D.Conn.1990) (bank did not owe duty to another bank to disclose a check kiting scheme the first bank had discovered); *E.F. Hutton Mortg. Corp. v. Equitable Bank, N.A.,* 678 F.Supp. 567 (D.Md.1988) (bank had no duty to inform third party of its suspicions of fraud by its customer, as there was no contractual or fiduciary relationship requiring disclosure); *Guidry v. Bank of LaPlace,* 661 So.2d 1052, 1059 (La.App.1995) (bank was "clearly under no duty to disclose information about its customer to a non-customer"); *Glass v. Berkshire Development,* 612 So.2d 749 (La.App.1992) ("a bank owes no duty to a third person with whom" the bank's depositor "does business"); *Citizens State Bank, Enderlin v. Schlagel,* 478 N.W.2d 364 (N.D.1991) ("Ordinarily, a bank has no affirmative duty to disclose a customer's financial

condition."); *First Nat'l Bank and Trust Co. v. Brakken,* 468 N.W.2d 633, 637 (N.D.1991) ("a bank generally has no affirmative duty to disclose a customer's financial condition to anyone").

■ Despite this general principle, the Lenders argue that National Bank owed them a duty to take affirmative measures to avoid any loss to them caused by Charter Title's check kiting. The Lenders analogize the Bank's duty to that of a tavern owner who serves liquor to an intoxicated patron. *See Ontiveros v. Borak,* 136 Ariz. 500, 667 P.2d 200 (1983). They argue that just as a tavern owner owes a duty to third parties whom the patron may injure while driving drunk, the Bank owes a duty to third parties who may foreseeably be harmed by a depositor's check kiting. In making this argument, the Lenders correctly state that the appropriate focus is always on the relationship between the parties, and the obligations arising out of that relationship. *See Ontiveros,* 136 Ariz. at 508, 667 P.2d at 208; *Maurer v. Cerkvenik–Anderson Travel, Inc.,* 181 Ariz. 294, 890 P.2d 69 (1994).

The Lenders do not restrict their argument to the *Ontiveros* analogy. They also cite cases that discuss the duty of banks to disclose the status of a customer's account. They rely most heavily on *Peck.* 108 N.M. 84, 766 P.2d 928. In *Peck,* the court determined that a bank had a duty to disclose information about its customer to a third party. After examining a number of other cases, the court articulated a test to determine when such a duty arises. It held that three relationships between a third party and a bank will give rise to the duty: " '1. Where there is a previous definite fiduciary relation between the parties[;] 2. Where it appears one or each of the parties to the contract expressly reposes a trust and confidence in the other[;] 3. Where the contract or transaction is intrinsically fiduciary and calls for perfect good faith.' " *Id.* at 89, 766 P.2d at 933 (quoting *Macon County Livestock Mkt., Inc. v. Kentucky State Bank, Inc.,* 724 S.W.2d 343, 349 (Tenn.App.1986)). The court in *Peck* then explained that the presence of one of these relationships was only a threshold to the existence of a duty. The court stated that

due to the competing interest of customer confidentiality, *special circumstances* must be shown in order for the duty to arise. The court discussed four circumstances:

[1.] One who speaks must say enough to prevent his words from misleading the other party.

[2.] One who has special knowledge of material facts to which the other party does not have access may have a duty to disclose these facts to the other party.

[3.] One who stands in a confidential or fiduciary relation to the other party to a transaction must disclose material facts.

... [4. One who has] actual knowledge that its customer is committing fraud [must disclose financial information].

*Id.* at 90, 766 P.2d at 934.

The facts in *Peck* were as follows. The third party who brought the claim had agreed to build a ski lodge and restaurant for the bank's customer. *Id.* at 87, 766 P.2d at 931. The bank's president assured the third party that a loan for the project had been funded. *Id.* After the bank's customer failed to make two payments to the third party, the bank specifically instructed the third party to make all pay requests directly to the bank, assuring the third party that all pay requests would be honored, even though the bank knew the loan funds were exhausted. *Id.* The court reasoned that "although the Bank may not have had an initial duty to disclose the status of Customer's account, once it affirmatively involved itself, vis-a-vis · Third Party, in the capacity other than as a money Lender, it had a duty to disclose...." *Id.* at 91, 766 P.2d at 935. In *Peck,* the plaintiff established that he had reposed trust and confidence in the bank. *See id.* This was the special relationship which was the threshold requirement for recovery. The court also found in that case that a special circumstance—special knowledge that the loan funds had been depleted—existed so that the requisites for the existence of a duty had been met.

In our case, the Lenders argue that:

This case fits squarely within [*Peck's* ] principles, as any one of the three relationships is enough to establish a legal duty

here. For example, in directing that their funds be deposited with National Bank, the lenders reposed trust and confidence in National Bank to take reasonable steps to assure that its customer would not use a National Bank account to facilitate fiduciary fraud. Regardless of whether National Bank knew the lenders' names, it knew it held money in a "trust" account controlled by a check-kiter.

The Lenders also apparently seek to show the existence of a special relationship between the Lenders and the Bank, based on representations that Murphy made concerning Lucido–Wood's construction budget and credit history. We disagree that a special relationship arose. These representations had nothing to do with Charter Title, the Bank's customer. The record shows that the Bank's loan officer, Murphy, had sporadic contact with Claypool, the owner of Gilbert & Sullivan. Claypool periodically updated Murphy about the loans to Lucido–Wood; he also informed Murphy that Charter Title had been selected as the escrow company and that the loan proceeds were deposited at National Bank. National Bank may have been selected as the depository as a token of appreciation, but the record does not support the inference that the Lenders intended to expressly repose trust in the Bank by directing Charter Title to deposit the funds with them. The Bank had no financial dealings with the Lenders. Nor did the Bank make any representations to the Lenders about Charter Title.

The Lenders cite other cases in support of their argument that the bank owed them a duty of disclosure. In *State Bank v. Stoeckmann*, 417 N.W.2d 113, 116 (Minn.App.1987), the court approved a jury instruction which stated that special circumstances exist when a "bank knows or has reason to know that the customer is placing his or her trust and confidence in the bank, and is relying on the bank so to counsel and inform them." The court reasoned that the instruction was proper because the bank had dealt directly with the plaintiff and had failed to "discuss and explain the very documents which determined the rights and liabilities between the parties...." *Id.* at 118. National Bank did not deal directly with the Lenders. Nothing in the record supports the conclusion that the Lenders placed trust or confidence in the bank when they selected Charter Title as the escrow agent for the loan transaction.

In another case the Lenders cite, *Hooper v. Barnett Bank*, 474 So.2d 1253, 1255 (Fla. App.1985), *aff'd*, 498 So.2d 923 (1986), the record demonstrated that the bank had direct contact with the plaintiff, and had in fact assured the plaintiff that its customer's investments "were sound and had passed IRS scrutiny." Nowhere in the record before us do we find that the Bank made representations to the Lenders concerning Charter Title's financial condition.

In *Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648, 649 (1976), on which the Lenders also rely, the bank approved a loan to the Sjogrens, secured by an interest in real estate and fifty air purification units. National Pollution Eliminators, Inc., which was selling the purification units to the Sjogrens, was also a customer of Richfield Bank. *Id.* 244 N.W.2d at 649–50. Thompson, a loan officer at Richfield, dealt with both National Pollution and the Sjogrens. *Id.* The court held that special circumstances required disclosure because the bank had actual knowledge of the fraudulent activities of National Pollution. *Id.* at 652. Evidence showed that Thompson, the bank's loan officer, was listed as a credit reference for National Pollution, had personally loaned money to National Pollution, received "fringe" benefits from them, and actively participated in the affairs and decisions of National Pollution. *Id.* at 650. Here, National Bank did not engage in transactions with the Lenders.

The key distinguishing factor in all of the cases on which the Lenders rely is that the banks were directly involved with the third parties in the transactions that were the subject of litigation. This involvement satisfied the necessary relationship giving rise to the duty of disclosure. In the case before us, while the Bank may have been marginally involved with the Lenders' decision to finance Lucido–Wood, the Bank was not involved in the selection of Charter Title as an escrow

company. It was the choice of Charter Title which set the stage for the loss.

Clearly, when a bank's customer is an escrow agent, the bank knows there are third-party beneficiaries of the escrow agent's fiduciary account. We have considered whether a bank's knowledge that its customer is a fiduciary creates a duty to disclose irregularities to a beneficiary. We have not found any case that specifically deals with this question, although one case suggests that no duty arises simply by virtue of the fact that the customer is a fiduciary. In *Dodd v. Citizens Bank,* 222 Cal.App.3d 1624, 272 Cal.Rptr. 623 (1990), the plaintiff, Dodd, had contracted with Pacific Payroll Systems, Inc., to handle the payroll for his business. Pacific Payroll maintained a fiduciary account for this purpose at Citizens Bank, which was funded by Dodd. *Id.* at 1626, 272 Cal.Rptr. 623. After Pacific Payroll fraudulently diverted Dodd's funds, Dodd sued Citizens Bank, attempting to cast himself in the role of a customer of the bank, and claiming that the bank owed him a duty to send him monthly statements regarding items issued in his company's name from Pacific's payroll trust account. *Id.* The court decided that the bank did not owe Dodd a duty because he did not qualify as a customer. *Id.* at 1628, 272 Cal.Rptr. 623.

■ The Lenders in this case, unlike Dodd, do not claim that they were customers of National Bank. *Dodd* is nonetheless instructive; it implicitly stands for the proposition that absent a customer or other special relationship, a bank does not owe a duty of disclosure, even when its customer is a fiduciary.

We express no opinion as to whether the Bank owed a duty to any regulatory agency to report the irregularities that it observed. Although the Lenders mention that possibility, they do not brief this issue or rely on it as a ground for recovery in this case. We recognize that check kiting often has a very damaging effect on innocent persons, and a bank's failure to put an end to the practice contributes to such damage. On the other hand, requiring a bank to monitor all of its fiduciary customer's accounts and notify beneficiaries who might be harmed by an over-

draft would be a heavy burden. So, too, a bank cannot know the details of its customers' transactions. What appears suspicious may in fact be proper. In the absence of any statute or case law that creates the duty for which the Lenders argue, we are reluctant to do so.

The Lenders also argue that the order granting summary judgment should be reversed because the trial court denied a request for additional discovery pursuant to Rule 56(f), Arizona Rules of Civil Procedure. The Lenders sought to depose two National Bank employees and stated that the depositions would help them ascertain the extent of National Bank's knowledge of Charter Title's check kiting. We need not decide if the request for additional discovery was properly denied. Since the Bank had no relationship with the Lenders that created a duty to disclose information about Charter Title, additional discovery could not alter the outcome.

Nor do we address the Lenders' arguments regarding the trial court's discussion of causation of damages and supposed erroneous findings of fact. Again, given our conclusion that the Bank had no duty of disclosure, causation is irrelevant. The erroneous findings argument is moot because we have examined the entire record in the light most favorable to the Lenders.

Finally, we need not address the Lenders' contention that the trial court improperly looked to the Bank's standard of conduct, rather than at the parties' relationship, when determining the question of duty. *See Coburn v. City of Tucson,* 143 Ariz. 50, 51–52, 691 P.2d 1078, 1079–80 (1984). Because we have held that National Bank did not owe the Lenders a duty, it is unnecessary to determine whether the trial court's precise analysis was proper.

We affirm the order granting the motion for summary judgment.

EHRLICH, P.J., and PATTERSON, J., concur.