309 P.3d 898

**KOSS CORPORATION, a Delaware corporation, Plaintiff/Appellant,**

v.

**AMERICAN EXPRESS COMPANY, a New York corporation; American Express Travel Related Services Company, Inc., a New York corporation; Amex Card Services Company, a Delaware corporation; Pamela S. Hopkins, Defendants/Appellees.**

No. 1 CA–CV 11–0635.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 29, 2013.

As Amended Sept. 3, 2013.

---

* Chief Justice Rebecca White Berch recused herself from this case. Pursuant to Article 6, Section 3 of the Arizona Constitution, the Honorable Lawrence F. Winthrop, Judge of the Court of Appeals, Division One, was designated to sit in this matter.

Law Offices of Richard W. Shapiro, PLC by Richard W. Shapiro, Phoenix, and Eagan Avenatti, LLP by Michael J. Avenatti, Pro Hac Vice, Newport Beach, CA, Attorneys for Plaintiff/Appellant.

Greenberg Traurig, LLP, by Pamela M. Overton, Julie R. Barton, Phoenix, and Greenberg Traurig, LLP, by Louis Smith, Pro Hac Vice, Florham Park, NJ, Attorneys for Defendants/Appellees.

## OPINION

KESSLER, Judge.

¶ 1 Appellant, Koss Corporation ("Koss") appeals the superior court's dismissal of its complaint against American Express Company, American Express Travel Related Services Company, Inc., and AMEX Card Services Company ("American Express"), and Pamela S. Hopkins ("Hopkins") (collectively "Appellees"). This case concerns alleged defalcations by a Koss employee using wire transfers and cashier's checks to pay her personal American Express bills. Pursuant to Arizona Rule of Civil Procedure 12(b)(6), the superior court dismissed Koss's common-law claims for conversion, negligence, aiding and abetting fraud, and aiding and abetting a breach of fiduciary duty after determining, in part, that the Uniform Commercial Code ("U.C.C.") preempted those claims. In addition, the court dismissed Koss's negligence claim on the basis that Appellees had no duty to Koss and the conversion claim on the theory that a party cannot convert a check.

¶ 2 We affirm the dismissal of the negligence claim but reverse the dismissal of the other common-law claims for several reasons. First, the U.C.C. does not displace Koss's common-law claims that concern wire transfers because those claims are grounded on allegations that Appellees knowingly aided and abetted a Koss employee's defalcations— allegations that do not pertain to any defect or irregularity in the wire transfer process. Second, the U.C.C. does not preclude a common-law conversion of cashier's check claim under these circumstances. However, we affirm the dismissal of the negligence claim because we agree Appellees did not owe a duty under negligence law to Koss to disclose such defalcations.

## FACTUAL AND PROCEDURAL HISTORY

¶ 3 Koss is a Wisconsin-based designer, manufacturer, and marketer of high-fidelity headphones. Koss's former Vice President of Finance, Sujata Sachdeva ("Sachdeva"), supervised the accounting department. Between February 2008 and December 2009, she allegedly embezzled approximately $16,000,000 from Koss by wiring funds from Koss accounts to pay charges on her personal American Express credit card. During this time, Sachdeva also paid her American Express bills and other third parties by using cashier's checks drawn on Koss bank accounts totaling approximately $4,000,000. She also withdrew approximately $200,000

from a Koss bank account using what the complaint called "manual checks," which we interpret to mean checks drawn on Koss bank accounts.

¶ 4 During this time, Hopkins was managing the American Express Fraud Operations Group in Glendale. This group included the Financial Crimes Reporting Unit, which was responsible for "analyzing bank wire transactions used to pay card member accounts." Koss alleged that American Express and Hopkins accepted more than fifty wire transfers from Koss accounts for payment of Sachdeva's credit card balances.

¶ 5 According to the complaint, Appellees failed to develop and maintain a program designed to detect and report suspicious activity that might show financial crimes. For example, the complaint alleged that in October 2008, American Express knew that Sachdeva had wired $120,000 from Koss's corporate accounts to pay for charges on her personal card and did little or nothing about it except to learn that Sachdeva was employed by Koss with an annual salary of approximately $200,000. American Express allegedly continued to accept other wire transfers without properly reviewing them for possible fraud and failed to alert Koss to what Sachdeva was doing. In August 2009, an American Express Financial Crimes Reporting Unit analyst allegedly inquired into payments on Sachdeva's card made in June 2009 and alerted another unit member that, since October 2008, Sachdeva had purchased about $3,500,000 in luxury goods and paid her credit card bills with funds wired from Koss bank accounts. The latter employee allegedly recognized this conduct as a "clear case of embezzlement" and alerted another American Express Financial Intelligence Unit member and Hopkins about Sachdeva's activities in early August 2009. Appellees allegedly took no action on this report despite the employee's recommendations that they contact Koss and appropriate authorities. It was not until December 18, 2009, that American Express contacted Koss to inquire about Sachdeva's wire transfers. Koss immediately terminated Sachdeva's employment and notified the Federal Bureau of Investigation.

¶ 6 As relevant to this appeal, Koss sued, alleging that by accepting the wire transfers and cashier's checks, Appellees aided and abetted Sachdeva's breach of fiduciary duty to Koss and her fraud, and were liable for negligence. Koss also asserted a common-law conversion claim against American Express based on its control over Koss funds transferred by the wire transfers and cashier's checks. Koss sought the return of each "payment and transfer" and punitive damages.

¶ 7 Appellees moved to dismiss the complaint under Rule 12(b)(6) arguing: (1) the U.C.C. displaced or preempted the common-law claims; (2) Koss could not state a claim for conversion of checks because a check is not property, but an obligation; and (3) Appellees did not owe Koss a duty of care as required to state a claim for negligence. Koss argued that the U.C.C. did not displace the common-law claims and that Appellees owed a duty of care to Koss or voluntarily assumed a duty. At a later oral argument, Koss sought to add claims for fraudulent concealment and non-disclosure, and to identify "the exact beneficiary bank for each of the wire transfers at issue [and] the exact beneficiary for each of the wire transfers." [1]

¶ 8 The superior court granted Appellees' motion and dismissed Koss's claims. In so doing the court ruled: (1) The U.C.C. preempted Koss's common-law claims, and its sole remedy was under the U.C.C; (2) Under Arizona Revised Statutes ("A.R.S.") sections 47–4A202 through –4A204 (2005 & Supp.2012),[2] a receiving bank must refund any payment made pursuant to a payment order, and because Appellees were not a receiving bank, they were not responsible for Koss's loss; (3) Relying in part on *Berthot v.*

---

1. Neither in their motion to dismiss nor on appeal have Appellees argued that Hopkins should be dismissed for any separate reason. Accordingly, we will refer to Appellees' potential liability without distinguishing between American Express and Hopkins.

2. We cite to the current version of any statute unless the statutory language was changed after the underlying events and such change affects the result of the appeal.

*Sec. Pac. Bank of Ariz.*, 170 Ariz. 318, 321, 823 P.2d 1326, 1329 (App.1991), A.R.S. § 47–3420(A)(1) (2005) barred Koss's conversion claims because the drawer of a check may not bring such a claim against a payee, and a check is an obligation and not property that can be converted; and (4) Appellees did not owe a duty of care to Koss.

¶ 9 Koss timely appealed. We have jurisdiction pursuant to A.R.S. § 12–2101(A)(1), (A)(5)(a) (Supp.2012).

## DISCUSSION

### I. Issues on appeal, standards of review, and statutory construction.

¶ 10 On appeal, Koss argues the U.C.C. did not preclude its common-law claims, its complaint stated a cause of action for common-law conversion, and Appellees owed it a duty of care so the court should not have dismissed its negligence claim.[3]

¶ 11 We review the superior court's judgment *de novo* both to the extent it is based on a matter of statutory interpretation and because it dismissed the complaint under Rule 12(b)(6). *City of Tucson v. Clear Channel Outdoor., Inc.*, 209 Ariz. 544, 547, ¶ 8, 105 P.3d 1163, 1166 (2005); *see also Coleman v. City of Mesa*, 230 Ariz. 352, 355–56, ¶ 7, 284 P.3d 863, 866–67 (2012). "In reviewing a trial court's decision to dismiss a complaint for failure to state a claim, we assume as true the facts alleged in the complaint and will not affirm the dismissal unless satisfied as a matter of law that plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof." *Fidelity Sec. Life Ins. Co. v. Ariz. Dep't of Ins.*, 191 Ariz. 222, 224, ¶ 4, 954 P.2d 580, 582 (1998). However, such facts must be well-pled. *Jeter v. Mayo Clinic Ariz.*, 211 Ariz. 386, 389, ¶ 4, 121 P.3d 1256, 1259 (App.2005).

¶ 12 We review issues of statutory construction *de novo* with the goal of giving

effect to legislative intent. *Short v. Dewald*, 226 Ariz. 88, 93–94, ¶ 26, 244 P.3d 92, 97–98 (App.2010). "[W]hen construing a statute, 'we examine its individual provisions in the context of the entire statute to achieve a consistent interpretation.'" *Id.* at 94, ¶ 26, 244 P.3d at 98 (quoting *State v. Gaynor–Fonte*, 211 Ariz. 516, 518, ¶ 13, 123 P.3d 1153, 1155 (App.2005)). "[W]e look to the plain language as the most reliable indicator of meaning." *Powers v. Carpenter*, 203 Ariz. 116, 118, ¶ 9, 51 P.3d 338, 340 (2002). However, we will not construe a statute literally when such a construction would lead to an absurd result, would conflict with clear legislative intent, or would be contrary to the rest of the statutory scheme. *See N. Valley Emergency, Specialists, L.L.C., v. Santana*, 208 Ariz. 301, 303, ¶ 9, 93 P.3d 501, 503 (2004); *Oaks v. McQuiller*, 191 Ariz. 333, 334, ¶ 5, 955 P.2d 971, 972 (App.1998).

¶ 13 "The [U.C.C.] should be construed in accordance with its underlying purposes and policies. The text of each section should be read in the light of the purpose and policy of the rule or principle in question, as [sic] also of the [U.C.C.] as a whole, and the application of the language should be construed narrowly or broadly, as the case may be, in conformity with the purposes and policies involved." Official Uniform Commercial Code § 1–103 cmt. 1 (stating that properly construing the U.C.C. requires "that its interpretation and application be limited to its reason"); *accord* A.R.S. § 47–1103 (Supp. 2012). Broadly defined, the underlying purposes and policies of the U.C.C. include simplifying, modernizing, and clarifying commercial transactions law and creating uniformity among various jurisdictions. A.R.S. § 47–1103(A); *accord* U.C.C. § 1–103 cmt. 1.

### II. Koss's common-law claims are not preempted by the U.C.C.

¶ 14 The superior court held that Koss's common-law claims were preempted by the

---

**3.** Koss did not appeal the dismissal of its claim for statutory conversion under A.R.S. § 47–3420. On appeal, Koss also argues that it stated a claim for aiding and abetting fraud and breach of fiduciary duty and if the U.C.C. precludes the common-law claims, it is unconstitutional under the anti-abrogation clause in Article 18, Section 6, of the Arizona Constitution. It also argues the su-

perior court erred in denying Koss's motion to amend its complaint and in denying Koss's motion for new trial. We address the aiding and abetting claims below. Given our resolution of the preemption issue, we do not need to discuss the constitutional issues or the denial of Koss's request to amend and motion for new trial.

U.C.C. More specifically, the court first held that Article 4A (A.R.S. §§ 47–4A202 through 4A204) barred Koss's claims. Since those sections deal with wire transfers, we understand the order to hold that all of Koss's common-law claims based on wire transfers were preempted. Second, the court held that at a minimum Koss's common-law conversion claim was preempted by Article 3 (A.R.S. § 47–3420(A)(1)).[4] Since Article 3 deals with negotiable instruments, in this case, cashier's checks, we read the order as holding that the conversion and other common-law claims were barred to the extent they were based on the cashier's checks paid to American Express. Finally, the court held that the negligence claims were also preempted by the U.C.C. which we read as applying to both the wire transfers and the checks.

¶ 15 We reach different conclusions than the superior court. First, since the common-law claims did not arise out of the mechanics of wire transfers but out of American Express's acceptance and use of Koss funds while allegedly knowing that Sachdeva was embezzling those funds from Koss to pay her own American Express charges, they do not come within the remedies of Article 4A. Second, as relevant here, A.R.S. § 47–3420(A)(1) only bars common-law conversion claims brought by the "drafter" and "issuer" of negotiable instruments, and as a matter of law, Koss was neither the "drafter" nor "issuer" of the cashier's checks. The common-law claims can proceed, subject to possible

U.C.C. and other defenses, including but not limited to the defense that American Express is a holder in due course.[5]

¶ 16 We begin with a general discussion of U.C.C. preemption and then discuss the limits of such preemption as to wire transfers. We will then turn to the limits on preemption as to the cashier's checks.[6]

■ ¶ 17 The U.C.C. does not preempt common-law causes of action unless particular provisions of the U.C.C. displace those actions. A.R.S. § 47–1103(B), like U.C.C. § 1–103(b), provides "[u]nless displaced by the particular provisions of [this title], the principles of law and equity ... fraud, misrepresentation ... supplement [the U.C.C.'s] provisions." U.C.C. § 1–103 cmt. 2, provides:

> [W]hile principles of common law and equity may *supplement* provisions of the [U.C.C], they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the [Code] provides otherwise. In the absence of such a provision, the [Code] preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies." [7]

*See also Berthot*, 170 Ariz. at 321, 823 P.2d at 1329 (stating when a provision of the Arizona version of the U.C.C. displaces the common-law on that issue, the common-law no longer applies; holding that a common-law claim for

4. The superior court's ruling expressly applied A.R.S. § 47–3420(A)(1) to the conversion of checks. However, the court also held that the U.C.C. implicitly precluded common-law causes of action when it provides a statutory remedy. Since A.R.S. § 47–3420 creates a statutory conversion action, we interpret the superior court's ruling to mean that if the conversion claim based on the cashier's checks was preempted, then all the common-law claims based on those checks were preempted.

5. In so holding, we do not render any opinion on whether holder in due course concepts might apply to the wire transfers.

6. On appeal, Appellees concede that there is no choice of law problem in applying the U.C.C. because both Wisconsin and Arizona have adopted the U.C.C. We agree.

7. While the comments to the U.C.C. were not adopted by the legislature as comments to the Arizona version of the U.C.C, we look to cases arising under the uniform act and the U.C.C. commentary for guidance because the relevant provisions of the state act mirror the U.C.C. *Sun Valley Ranch 308 Ltd., P'Ship v. Robson*, 231 Ariz. 287, 291, ¶ 8, 294 P.3d 125, 129 (App.2012) (holding that comments to uniform acts are highly persuasive unless they are erroneous or conflict with settled Arizona policy); *In re Estate of Dobert*, 192 Ariz. 248, 252, ¶ 17, 963 P.2d 327, 331 (App.1998) (same). Throughout this opinion we provide cites to the Arizona statutes that correspond to the U.C.C. provisions and comments discussed.

conversion was displaced by U.C.C. § 3–419, adopted as A.R.S. § 47–3419 (2005)).

### A. Article 4A does not preempt Koss's common-law claims based on the wire transfers.

¶ 18 Fund or wire transfers are governed by Article 4A of the U.C.C. U.C.C. Article 4A is "intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in *any situation covered by particular provisions of the Article*." U.C.C. § 4A–102 cmt. (emphasis added); *accord* A.R.S. § 47–4A102; *Trustmark Ins. Co. v. Bank One, Ariz., N.A.*, 202 Ariz. 535, 538, ¶ 14, 48 P.3d 485, 488 (App. 2002) (holding that Arizona's Article 4A provides the "controlling body of law for those wire transfers within its scope"). Thus, the first question is whether Article 4A encompasses the misconduct and claims that Koss alleges in its complaint. *See Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89–90 (2d Cir.2010) ("For Article 4A purposes, the critical inquiry is whether its provisions protect against the type of underlying injury or misconduct alleged in a claim.").

¶ 19 Article 4A does not apply to the alleged misconduct here for two reasons. First, the claims do not involve allocating liability among Koss and the various banks involved in funds transfers based on the funds transfer process and whether the funds transfers were authorized as defined by the U.C.C. Rather, Koss's claims are aimed at Appellees' accepting Sachdeva's wire transfers of Koss funds to pay her American Express bills after all the wire transfers were completed. Second, given the allega-

tion that Appellees knew of Sachdeva's misconduct and decided not to alert Koss to such misconduct, Appellees would be using the U.C.C. to preclude Koss from obtaining a remedy for fraud, which is not the objective of the U.C.C.

¶ 20 In the ordinary wire transfer there are at least two payment orders. The first payment order would be by the originator (Sachdeva, acting for Koss) to the receiving bank, which was Koss's bank.[8] Here, the second payment order would be from Koss's bank to American Express's bank, the "beneficiary's bank." *See* A.R.S. § 47–4A103. As U.C.C. § 4A–203 cmt. 1 (A.R.S. § 47–4A203) explains:

> In the wire transfer business the concept of 'authorized' is different from that found in agency law. In that business a payment order is treated as the order of the person in whose name it is issued if it is properly tested pursuant to a security procedure and the order passes the test. Section 4A–202 reflects the reality of the wire transfer business. A person in whose name a payment order is issued is considered to be the sender of the order if the order is 'authorized' as stated in subsection (a) or if the order is 'verified' pursuant to a security procedure in compliance with subsection (b). If subsection (b) does not apply, the question of whether the customer is responsible for the order is determined by the law of agency.... Under Section 4A–202, the issue of liability of the purported sender of the payment order will be determined by agency law only if the receiving bank did not comply with subsection (b).[[9]]

---

8. "Transactions covered by Article 4A typically involve very large amounts of money in which several transactions involving several banks may be necessary to carry out the payment." U.C.C. § 4A–104 cmt. 2; *accord* A.R.S. § 47–4A104 (2005). A funds transfer begins when the originator makes a "payment order" to a bank for the benefit of the beneficiary. A.R.S. § 47–4A104. A "payment order" is an instruction to a bank "to pay, or to cause another bank to pay," an amount of money to a beneficiary. A.R.S. § 47–4A103(A)(1) (2005). A "receiving bank" is "the bank to which the sender's instruction is addressed." A.R.S. § 47–4A103 (A)(4). A receiving bank may be the originator's bank, any intermediary banks, or the beneficiary's bank. A.R.S.

§ 47–4A104(2), (4)(a). A "beneficiary's bank" is "the bank identified in a payment order in which an account of the beneficiary is to be credited. or which otherwise is to make payment to the beneficiary." A.R.S. § 47–4A103(A)(3).

9. To the extent Koss's claims have been interpreted by Appellees and seemingly the superior court as suggesting that Sachdeva was not authorized to originate the funds transfers at issue, we understand Koss's claims to assert only that Sachdeva was not permitted to use company funds to pay her personal credit cards. We do not interpret Koss's assertions about Sachdeva's actions to mean she was not authorized to initiate funds transfers as that term is defined by

¶ 21 Importantly for this case, a funds transfer is completed when the beneficiary's bank accepts "a payment order for the benefit of the beneficiary of the originator's payment order." A.R.S. § 47–4A104(*l*). Thus, the wire transfers in this case were completed when the funds were wired to American Express's bank.

¶ 22 A review of Article 4A demonstrates that it carefully and comprehensively governs the rights and responsibilities between the originator and the originator's bank and between intermediary banks involved in payment orders, A.R.S. §§ 47–4A402 (2005), –4A403 (2005), as well as between a beneficiary's bank and the beneficiary, A.R.S. §§ 47–4A404 (2005), –4A405 (2005). *See also* U.C.C. § 4A–102 cmt. (stating that before the U.C.C. "there was no comprehensive body of law—statutory or judicial—that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders"). Article 4A also apportions liability among those parties depending upon the point at which a failure in the funds transfer process occurs. U.C.C. § 4A–102 cmt. ("A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability. . . ."). For these reasons, the actions of the parties involved in a funds transfer that implicate the transaction itself are exclusively governed by Article 4A.

¶ 23 However, the U.C.C. does not necessarily preempt claims based on additional actions that occur *outside* the funds transfer process or exceed the allocation of liability under Article 4A provided the application of other law is not inconsistent with Article 4A. *See* James J. White & Robert S. Summers, *Uniform Commercial Code, Practitioner Treatise Series* § 22–4 at 29 (5th ed.2008) (hereinafter "White & Summers Vol. 3") ("When there is some sort of additional act that occurred outside of the funds transfer itself ... there is no reason to preclude a state law fraud claim."); *Ma*, 597 F.3d at 89 ("Practically speaking, Article 4A controls how electronic funds transfers are conducted and specifies certain rights and duties related to the execution of such transactions. . . . Claims that, for example, are not about the mechanics of how a funds transfer was conducted may fall outside of this regime."); *see also* A.R.S. § 47–1103(B) (stating "unless displaced by the particular provisions ... the principles of law and equity ... supplement [the U.C.C.'s] provisions" and providing a nonexclusive list of examples including fraud).

¶ 24 Here, the alleged misconduct did not occur during the process of wire transfers, but after the transfers were complete. Appellees applied the funds allegedly knowing Sachdeva had embezzled the money from Koss to pay her personal American Express bills, failed to inform Koss of the embezzlement, and kept the funds to pay the merchants associated with the charges less fees earned by American Express on the charges.[10] As such, the alleged misconduct

Article 4A of the U.C.C. Koss's complaint does not assert that Sachdeva was unauthorized to make payment orders as that term is defined by Article 4A, and in its opening brief on appeal, Koss states "the claims do not challenge the authority for executing any funds transfer." In addition, at oral argument, Koss confirmed that Sachdeva was a signer on the account, and that it was not claiming that the funds transfers or payment orders involved here were defective in and of themselves.

10. Appellees contend that American Express did not benefit from the defalcations because the money ultimately received from the wire transfers and checks was used to pay the merchants from whom Sachdeva had purchased products and services on her American Express cards. This argument ignores that the complaint alleged that American Express and Hopkins ignored the fraudulent transfers so that Sachdeva could continue to use her American Express card "thus enriching Defendant AMEX at the expense of Koss." In response to the motion to dismiss, Koss explained that American Express had not stopped Sachdeva until "its own account balances were paid, thereby limiting its own personal financial losses." At oral argument in this Court, Appellees agreed with that statement, explaining that American Express had paid all the merchants and it would now be the one to sustain any loss if Koss were to prevail. Given the procedural setting, we will not affirm the dismissal unless satisfied as a matter of law that "plaintiffs would not be entitled to relief under any interpretation of the facts susceptible of proof." *Fidelity*, 191 Ariz. at 224, ¶ 4, 954 P.2d at 582.

is outside the regime of Article 4A governing wire transfers because the wire transfer process had ended with receipt of each transfer to American Express's bank. What Appellees did with those funds after each such transfer is not governed by Article 4A.

¶ 25 Other courts have recognized that Article 4A does not preempt common-law claims when, as here, the alleged misconduct occurred outside the wire transfer process. For example, in *Sheerbonnet, Ltd. v. American Express Bank, Ltd.*, the plaintiff sold ships to another company and was to be paid by a wire transfer from the buyer's bank through American Express Bank ("AEB") and then ultimately from AEB to the plaintiff's accounts at Bank of Credit and Commerce, S.A. ("BCCI"). 951 F.Supp. 403, 405 (S.D.N.Y.1995). However, after learning that all BCCI's accounts had been frozen by government regulators, AEB received the transfer, applied it to BCCI's account with AEB and then made a claim to the funds based on debts owed to AEB by BCCI. *Id.* Ultimately, AEB kept the wired funds for its own benefit. *Id.* The plaintiff sued AEB for conversion, tortious interference with contract, and unjust enrichment. *Id.* at 414. The court determined that "these circumstances, not specifically provided for in an otherwise thorough statutory scheme [Article 4A], demand resort to other legal principles in order to reach a fair resolution." *Id.* at 413–14. In other words, the common-law claims were not preempted by Article 4A.

¶ 26 In *Regions Bank v. Provident Bank, Inc.*, the plaintiff bank wired funds to an account maintained by a real estate lender named Morningstar. 345 F.3d 1267, 1271

(11th Cir.2003). After the plaintiff learned that Morningstar may have been engaged in fraud, it sought to have the transfer reversed, but Moringstar's bank—which was the beneficiary bank—refused and held on to the funds. *Id.* at 1272. The plaintiff brought state law claims against the beneficiary bank after the beneficiary bank set off amounts in Morningstar's account. *Id.* at 1273. The plaintiff claimed that the beneficiary bank accepted funds that it knew or should have known were fraudulently obtained. *Id.* The court determined that because Article 4A was silent with regard to claims based on the theory that the beneficiary bank should have known the funds were fraudulently obtained, a state law requiring disgorgement of the funds was not inconsistent with Article 4A. *Id.* at 1275–76. The court stated that "[i]nterpreting Article 4A in a manner that would allow a beneficiary bank to accept funds when it knows or should know that they were fraudulently obtained, would allow banks to use Article 4A as a shield for fraudulent activity." *Id.* at 1276.[11]

¶ 27 We have found one case which applied the above principles to the alleged knowing misconduct of a beneficiary in keeping funds after the wire transfers had been completed. That case supports our conclusion here. In *Variety Wholesalers, Inc. v. Salem Logistics Traffic Services, LLC*, Variety contracted with Salem to pay and audit transportation bills incurred by Variety. 365 N.C. 520, 723 S.E.2d 744, 746 (2012). Under the contract, Salem received all of Variety's freight bills from carriers, audited the bills, and prepared master invoices for Variety, and Variety would then pay Salem who in turn paid the

11. Appellees point out that the reasoning of *Sheerbonnet* has been criticized by the commentators to the U.C.C. as being at odds with Article 4A's preemption provisions. U.C.C. 1–103 cmt. 2. That criticism was based on *Sheerbonnet* allegedly relying on language allowing common-law claims to proceed unless "explicitly displaced" by the U.C.C. *Id.* However, we do not read *Sheerbonnet* as relying on such language, but rather on the principle that the claims were not inconsistent with the policies underlying the U.C.C. Moreover, we note that one of the most respected commentators on the U.C.C. has concluded that *Sheerbonnet* and *Regions* were properly decided because they were based on alleged fraud by the defendants, and U.C.C. preemption should not apply to cases where the defendant was alleged to have acted fraudulently. White & Summmers Vol. 3 at 28.

Even if *Sheerbonnet* and *Regions* were properly subject to such criticism, that criticism is premised on the fact that the defendants in those cases were sued for conduct committed during and as part of the funds transfer process. The alleged conduct here occurred independently of and after the funds transfer process had been completed. The misconduct here had nothing to do with how funds were transferred, but instead concerned American Express's purported decision to say nothing to Koss when it allegedly knew the funds had been embezzled.

carriers. *Id.* Salem had Variety send the amounts owed to a Wachovia bank account. *Id.* However, Salem did not tell Variety that the bank account was controlled by another entity (Ark), which had made loans to Salem and used the bank account to pay off the Salem loans. *Id.* Ultimately, Variety's shippers complained about not getting paid, and Variety terminated the contract and filed suit against Salem to recover approximately $888,000 it had forwarded to the bank account but which Salem had not used to pay the carriers. *Id.* Variety then discovered that Ark controlled the account and demanded that Ark return the funds. *Id.* at 747. Ark refused and Salem added it as a defendant alleging conversion and constructive trust. *Id.* The trial court granted Variety summary judgment against Ark for conversion. *Id.* The state court of appeals reversed and entered summary judgment for Ark. *Id.* The North Carolina Supreme Court determined that there were fact issues precluding summary judgment and reversed and remanded on both claims. *Id.* at 753.

¶ 28 Thus, the issue in *Variety*—potential liability for conversion by the ultimate beneficiary (Ark) of funds claimed by the originator (Variety)—is the same issue presented here. *Variety* rejected the argument that the common-law claims against Ark were preempted by the U.C.C. *Id.* at 749 n. 3. The court reiterated the explanation in *Regions Bank* that "Article 4A is silent with regard to claims based on the theory that the beneficiary bank accepted funds when it knew or should have known the funds were fraudulently obtained." *Id.* (quoting *Regions Bank*, 345 F.3d at 1275). Accordingly, state law requiring a bank to disgorge such funds "is not inconsistent with the goals or provisions of Article 4A." *Id.* To hold otherwise would allow a bank, knowing funds were fraudulently obtained, "to use Article 4A as a shield for fraudulent activity ... [and] [i]t could hardly have been the intent of the [U.C.C] drafters to enable a party to succeed in engaging in fraudulent activity, so long as [the party] complied with the provisions of Article 4A." *Id.* (quoting *Regions Bank*, 345 F.3d at 1276).

¶ 29 *Variety* thus rejected the Article 4A preemption argument as applied to alleged fraudulent activity by the ultimate beneficiary of the fund transfers after the last fund transfer occurred. *Id.* We agree with that reasoning. If a bank involved in fund transfers cannot use Article 4A to preempt claims when the bank knows of the fraudulent nature of the fund transfers, then a beneficiary outside the funds transfer system should not be able to use Article 4A as a defense to aiding and abetting such fraud. Koss's common-law claims are not preempted by the U.C.C. and are consistent with the policy underlying the U.C.C.

¶ 30 Further, permitting common-law claims to proceed against Appellees here does not conflict with the purposes of the U.C.C. *See* ¶¶ 13 and 17, *supra; accord Ma*, 597 F.3d at 89 ("Claims that, for example, are not about the mechanics of how a funds transfer was conducted may fall outside of this regime."); *see also* A.R.S. § 47–1103(B); White & Summers Vol. 3 at 26.

¶ 31 Our conclusion is supported by Appellees' argument. They contend that if the U.C.C. applied, Koss's sole remedy is against its originating bank, and if it prevails on that claim, then the originating bank could proceed downstream against the other parties in the funds transfer process. However, the effect of Appellees' argument, as they effectively conceded at oral argument, is that Koss would have no remedy under the U.C.C. if, as Koss has alleged, Sachdeva had authority to order the fund transfers. This is because in that case, there would be no liability for the originating bank and that bank could not proceed downstream against other parties in the fund transfer process. At the same time, according to Appellees, the U.C.C. would preempt any common-law claims against Appellees even though they were alleged to have known of Sachdeva's fraud and took no action to stop it so that they could keep the funds being repeatedly transferred to their bank.

¶ 32 Appellees cannot have it both ways to the extent that the allegations fall outside of the funds transfer process. Appellees' argument fails because it runs counter to the principles of the U.C.C. by permitting

a beneficiary, knowing of the alleged fraud against the originator, to keep funds transferred to it and use the U.C.C. as a shield for its own wrongdoing. *Variety,* 723 S.E.2d at 749 n. 3. Second, common-law principles should not be preempted when they are consistent with the principles underlying the U.C.C.

¶ 33 Relying on comment 2 to U.C.C. § 4A–204, *accord* A.R.S. § 47–4A204, Appellees contend that dismissal of the claims against them is consistent with the comments to the U.C.C. because such "unauthorized" transfers usually involve fraud, and if they do, the originating bank's ultimate remedy is to recover from the beneficiary of the unauthorized order.

¶ 34 We reject that argument because it misstates both the allegations and the U.C.C. provisions involved. As noted at footnote 9 *supra,* Koss alleged that Sachdeva was authorized to initiate wire transfers for Koss with Koss's originating bank, but maintained that she was not authorized to embezzle funds from Koss to pay her personal American Express bills.

¶ 35 Appellees also take comment 2 to U.C.C. § 4A–204, *accord* A.R.S. § 47–4A204, out of context. That comment provides in pertinent part:

> Section 4A–204 is designed to encourage a customer to promptly notify the receiving bank that it has accepted an *unauthorized payment order.* Since cases of *unauthorized payment orders* will almost always involve fraud, the bank's remedy is normally to recover from the *beneficiary of the unauthorized order if the beneficiary was party to the fraud.* This remedy may not be worth very much and it may not make any difference whether or not the bank promptly learns about the fraud. But in some cases prompt notification may make it easier for the bank to recover some part of its loss from the culprit.

(Emphasis added.)

¶ 36 Appellees' argument is misplaced because A.R.S. § 47–4A204 and comment 2 to

U.C.C. § 4A–204 are aimed only at unauthorized orders. If an order is unauthorized or unenforceable against the bank's customer, as provided by A.R.S. § 47–4A202 and – 4A203, the bank must return the funds to the originator (Koss) and can proceed against the beneficiary (American Express) if the beneficiary was a party to the fraud. Here, however, Koss has not alleged and does not contend that the fund transfer orders were unauthorized. Rather, Sachdeva was alleged to have authority to issue the orders to the receiving bank, but misused that authority to embezzle funds from Koss. Thus, comment 2 to U.C.C. § 4A–204, *accord* A.R.S. § 47–4A204, is simply not applicable to the conduct alleged here.

¶ 37 Finally, the cases cited by American Express do not support the view that Article 4A preempts common-law claims arising from fraudulent conduct outside the fund transfer process.[12] In those cases the alleged misconduct was inextricable from the funds transfer transactions themselves. For example, in *Zengen, Inc. v. Comerica Bank,* Zengen brought common-law claims against its originating bank for processing four wire transfers ordered by the corporation's chief financial officer, who was embezzling funds from the corporation. 41 Cal.4th 239, 59 Cal.Rptr.3d 240, 158 P.3d 800, 802 (2007). The California Supreme Court affirmed summary judgment for the bank in part because Article 4A displaced those claims. *Id.* at 808. However, in *Zengen,* the corporation's theory was that the bank, as Zengen's originating bank, had failed to realize that the orders were unauthorized. *Id.* at 808–09. Unlike the situation here, in *Zengen* and the other cases relied upon by American Express, the misconduct arose out of irregularities in the wire transfer process. Thus, the critical inquiry in those cases was whether common-law claims could properly supplement the remedies provided by Article 4A without cre-

---

12. *See Ma,* 597 F.3d 84; *ReAmerica, S.A. v. Wells Fargo Bank Int'l,* 577 F.3d 102 (2d Cir.2009); *Donmar Enters., Inc. v. S. Nat'l Bank of N.C.,* 64 F.3d 944 (4th Cir.1995); *Zengen, Inc. v. Comerica Bank,* 41 Cal.4th 239, 59 Cal.Rptr.3d 240, 158 P.3d 800 (2007).

Appellees also rely on a number of unpublished decisions from various jurisdictions. We will not consider those decisions. *See* ARCAP 28(c); *Walden Books Co. v. Ariz. Dep't of Rev.,* 198 Ariz. 584, 589, ¶ 23, 12 P.3d 809, 814 (App. 2000).

ating responsibilities and liabilities that were inconsistent with Article 4A.

¶ 38 As conceded by Appellees and discussed at ¶ 21 *supra,* by definition a funds transfer is complete when the beneficiary's bank accepts payment for the beneficiary. As Appellees point out, they were not a receiving bank for purposes of the transfers, but merely the beneficiaries of the wire transfers. Article 4A does not purport to govern the rights and responsibilities between the originator and the beneficiary except to the extent that it prescribes that a fund transfer payment is accomplished when accepted by the beneficiary's bank and that if a payment is made to satisfy an obligation, "the obligation is discharged to the same extent discharge would result from payment to the beneficiary of the same amount in money." A.R.S. § 47–4A406(A), (B) (2005).[13]

¶ 39 After considering the alleged misconduct here, and based on the text of Article 4A and its purpose to "address the particular issues raised by this method of payment," U.C.C. § 4A–102 cmt., we hold that Article 4A does not preempt Koss's common-law claims as those claims apply to the wire transfers. At their core, Koss's common-law claims do not arise out of the fund transfer transactions, but rather from the retention of funds allegedly known to be embezzled. Insofar as Article 4A is implicated at all, the purpose and policies of Article 4A are not advanced by preempting, nor diminished by permitting Koss's common-law claims.

## B. Article 3 does not preempt Koss's common-law claims.

¶ 40 Each of Koss's claims alleges that in addition to accepting electronic fund transfers, Appellees also accepted cashier's checks obtained by Sachdeva from Koss accounts to pay off Sachdeva's personal credit card debt despite knowing the funds were embezzled from Koss. The superior court held that Koss's common-law conversion and negligence claims (and thus other common-law claims) were barred by A.R.S. § 47–3420(A)(1) because Koss was a drawer of those checks and the terms of that statute, while applying conversion principles to check transfers, expressly prohibit a drawer of the check from suing for conversion.[14]

¶ 41 We disagree with the superior court for three reasons. First, Koss's complaint does not allege that Sachdeva signed Koss checks made payable to American Express to pay her personal American Express charges, but that Sachdeva embezzled funds from Koss to purchase cashier's checks. As such, Koss was not the drafter of any check, and A.R.S. § 47–3420(A)(1)'s prohibition of an issuer of a check from suing for conversion is inapplicable. *See also* A.R.S. § 47–3105 (2005) (issuer of a check includes a drawer). Second, the court's reliance on *Berthot* is misplaced both because *Berthot* was decided under a prior version of the U.C.C. and concerned fraudulent endorsements, which are not present here. 170 Ariz. at 320–24, 823 P.2d at 1328–32. Third, just as with the wire transfers, the alleged misconduct here is not within the scope of Article 3 because the misconduct did not occur during the negotiation of checks, but after the checks were received by the payee, American Express. To that extent, the U.C.C. does not preempt common-law claims, but makes them subject to defenses, including whether Appellees were holders in due course.[15]

---

13. U.C.C. § 4A–406 cmt. 1 ("Subsection (a) states the fundamental rule of [U.C.C] Article 4A that payment by the originator to the beneficiary is accomplished by providing to the beneficiary the obligation of the beneficiary's bank to pay. Since this obligation arises when the beneficiary's bank accepts a payment order, the originator pays the beneficiary at the time of acceptance and in the amount of the payment order accepted.").

14. Any ruling under Article 3 is limited to the alleged four million dollars in cashier's checks which Koss claimed Sachdeva sent to Appellees to pay her card purchases. This is because Article 3 deals with negotiable instruments and not wire transfers. A.R.S. §§ 47–3102(A) (2005) ("This chapter applies to negotiable instruments. It does not apply to payment orders governed by chapter 4A...."); –3104(A), and (F) (2005) (defining negotiable instrument and providing that a check, including cashier's or teller's checks, may be an instrument).

15. At one point, the complaint states that Sachdeva wrote cashier's checks on Koss accounts both before and after February 19, 2008 to pay American Express. Koss later alleged that Sachdeva issued four million dollars in cashier's checks, and withdrew $200,000 from Koss ac-

¶ 42 A.R.S. section 47–3420(A) provides in pertinent part:

The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument.... An action for conversion of an instrument may not be brought by: 1. The issuer or acceptor of the instrument....

¶ 43 Checks are negotiable instruments governed by Article 3 of the U.C.C. *See* U.C.C. §§ 3–301 to –605; *accord* A.R.S. §§ 47–3101 through –3605 (2005 & Supp. 2012). More specifically, sections 47–3104(A) and (F) define negotiable instruments and provide that a check, including cashier's or teller's checks, may be an instrument. Appellees argued, and the superior court agreed, that since an "issuer" is the "maker or drawer" of a check, and the drawer of a check is the person who signs the check or orders payment, *see* A.R.S. § 47–3103(A)(3) (Supp.2012), Koss, as Sachdeva's employer, would be considered the issuer of the checks signed by Sachdeva. *See* A.R.S. § 47–3402(A) (2005) (providing that when a check is signed by an agent as such the represented person is bound by the agent's signature absent the agent lacking any authority to sign checks).[16]

¶ 44 Here, Koss's complaint did not allege that Sachdeva, acting as a corporate agent, signed Koss bank checks made payable to the order of American Express. The complaint alleged that Sachdeva used Koss funds to have cashier's checks drawn on Koss accounts at Koss's bank to pay her American Express account.[17] An entity authorizing the issuance of cashier's checks is not a drawer or issuer on those checks. Rather, the drawer (person ordering payment) is the bank on which the checks are written, and the drawee (the person ordered to make payment) is that same bank or a branch of that bank. A.R.S. §§ 47–3103(A)(2), (3) (defining drawer and drawee), and –3104(G) (defining who are the drawer and drawee on a cashier's check); *see also* A.R.S. § 47–3105(c) (defining an issuer as being a drawer of an instrument). Koss, or Sachdeva, depending on how the cashier's checks were prepared, would only be the remitter of the checks, that is, the person "who purchases an instrument from its issuer." A.R.S. § 47–3103(A)(11); *see also Prestige Imports, Inc. v. S. Weymouth Savs. Bank,* 75 Mass.App.Ct. 773, 916 N.E.2d 1015, 1021–22 (2009) (explaining the difference between a drawer, drawee, and remitter on a cashier's check and the limited rights of a remitter against the payee of a cashier's check purchased with defalcated funds of the remitter); *Transcon. Holding, Ltd. v. First Banks, Inc.,* 299 S.W.3d 629, 645–46 (Mo.Ct. App.2009) (explaining difference between cashier's checks and checks drawn on account of bank customer). Since Koss was not the drawer of the check, the prohibition of A.R.S. § 47–3420(A)(1) does not apply. *Cf. Halifax Corp. v. Wachovia Bank,* 268 Va. 641, 604 S.E.2d 403, 409–11 (2004) (holding the bar of Virginia's statute that is equivalent to U.C.C. § 3–420(A)(1) applied to plaintiff-

---

counts in manual checks to pay American Express and others between February 19, 2008 and December 2009. The complaint alleges that at least as of October 28, 2008, Appellees were aware of facts which put them on notice that Sachdeva was embezzling funds. While it is unclear when the checks were issued, we assume that the checks were issued sometime after Appellees were on notice of possible embezzlement. *See Fidelity,* 191 Ariz. at 224, ¶ 4, 954 P.2d at 582 (stating Rule 12(b)(6) motion should not be granted if plaintiff might prevail on any set of alleged facts); *see also* A.R.S. § 47–3307(B)(4)(b) (2005) and U.C.C. cmt. 5 thereto (providing that a payee has notice of a breach of fiduciary duty when it takes a check from a person's employer written by a fiduciary, such as one of the employer's officers, for payment of a debt known by the taker to be the personal debt of the fiduciary).

16. Koss does not claim that the checks drawing upon funds in its account were unauthorized or forged and it admits that Sachdeva was a signatory on its account.

17. We interpret the complaint's language about cashier's checks drawn on Koss accounts at Koss's bank to mean that Sachdeva had that bank issue cashier's checks made payable to American Express. Only in paragraph 22 of the complaint did Koss allege that Sachdeva used "manual checks" to "fraudulently [withdraw] approximately $200,000 in Koss funds" from Koss's bank. It does not allege that those manual checks were made payable to American Express.

employer's conversion action against depository bank based on bank's receipt of fraudulently written checks signed by plaintiff's comptroller).

¶ 45 Second, the superior court's reliance on *Berthot* was misplaced because that case was based on a prior version of the U.C.C. and was limited to cases involving fraudulent endorsements of checks, which are not alleged here. In *Berthot*, the defendant was the depository bank for the checks and had paid the plaintiff's father on checks made payable to the plaintiff based on a forged endorsement. 170 Ariz. at 319, 823 P.2d at 1327. The trial court found that the common-law negligence claim was displaced by A.R.S. § 47–3419, which provided that a check is converted when paid on a forged endorsement. *Id.* at 320, 823 P.2d at 1328. We affirmed, holding that when a provision of the U.C.C. displaces the common-law at issue, the common-law no longer applies. *Id.* at 321–24, 823 P.2d at 1329–32. We further held that since A.R.S. § 47–3419 provided for a statutory conversion, it displaced the common-law "theories of recovery based on the same activity." [18] *Id.* at 321, 823 P.2d at 1329. We are now dealing, however, with an amended version of the U.C.C.[19] and not with forged endorsements.

¶ 46 Nor does the second sentence of A.R.S. § 47–3420(A) impliedly preempt a common-law conversion action under these alleged facts. The second sentence merely provides that an instrument is also converted if it is "taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument." A.R.S. § 47–3420(A). Koss's bank did not transfer the checks to anyone. Presumably, it issued the checks by giving them to Sachdeva to mail to American Express. This is not a transfer. *See Perrino v. Salem, Inc.*, 243 B.R. 550, 558 (D.Me.1999) (citing a Maine statute and stating "[a]n instrument is transferred when it is *delivered by a person other than its issuer* for the purpose of giving to the person receiving delivery the right to enforce the instrument."); A.R.S. § 47–3202(A) (2005). Thus, even if the intent behind A.R.S. § 47–3420 was to displace common-law conversion actions if the U.C.C. provides statutory remedy, *see Halifax*, 604 S.E.2d at 411 (interpreting Virginia's code), the second sentence of the statute does not provide a statutory conversion action.

¶ 47 Third, subject to holder in due course defenses which might be available to Appellees,[20] the alleged misconduct here is not within the framework of the U.C.C.'s regulation of the negotiation of checks.[21] Just as with wire transfers, the alleged misconduct here is the cashing of checks by the authorized person to receive payment, American Express, when it allegedly knew that the funds had been embezzled from Koss by Sachdeva. Nothing in A.R.S. § 47–3420 attempts to provide a cause of action for statutory conversion of property based on such facts. Thus, a common-law conversion action by a remitter, such as Koss, is not displaced

18. While the court later noted that no claim for common-law conversion was alleged, that is not material because the court expressly found that the statutory conversion claim displaced and subsumed common-law causes of action. *Id.* at 323–24, 823 P.2d at 1331–32.

19. The current version of U.C.C. § 3–420(a) adopts the prohibition of *Stone & Webster Engineering Corp. v. First National Bank & Trust Co.*, 345 Mass. 1, 184 N.E.2d 358, 361 (1962) (holding that drawer had no cause of action against collection bank that cashed stolen check, since only the payee or subsequent holder, not the drawer, could present the check to the drawee for payment). *See* U.C.C. § 3–420(a) cmt. 1.

20. *See Prestige*, 916 N.E.2d at 1021 n. 11 (unless the payee is a holder in due course, a negotiation of a check is subject to any remedy permitted by law which are supplied by the common-law); A.R.S. § 47–3202(B) ("To the extent permitted by other law, negotiation may be rescinded or may be subject to other remedies, but those remedies may not be asserted against a subsequent holder in due course or a person paying the instrument in good faith and without knowledge of facts that are a basis for rescission or other remedy."); A.R.S. § 47–3306 (2005) ("A person taking an instrument, other than a person having rights of a holder in due course, is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds.").

21. There may be other defenses available to Appellees as to accepting and cashing the cashier's checks. Nothing in this decision addresses or limits the applicability of such defenses.

by the U.C.C. A.R.S. § 47–1103(B) (providing that "[u]nless displaced by the particular provisions ... the principles of law and equity supplement [the U.C.C.'s] provisions" and providing a nonexclusive list of examples including fraud); White & Summers Vol. 3 at 29 ("When there is some sort of additional act that occurred outside of the funds transfer itself ... there is no reason to preclude a state law fraud claim."). As one commentator has noted, the U.C.C. leaves a gap in the rights of remitters of cashier's checks and to the extent the code does not address a right, such rights are not displaced pursuant to U.C.C. § 1–103 (A.R.S. § 47–1103) so that courts should fashion common-law rights for remitters. Gregory E. Maggs, *Determining the Rights and Liabilities of the Remitter of a Negotiable Instrument: A Theory Applied to Some Unsettled Questions*, 36 B.C. L.Rev. 619, 633–34 (1995). In applying that theory, the commentator has suggested that courts should allow remitters to bring common-law conversion actions against payees of cashier's checks based on underlying fraud or the payee's knowledge of such fraud. *Id.* at 658.

¶ 48 This, of course, does not mean that Appellees are liable as a matter of law for American Express's accepting the cashier's checks payable to it on Sachdeva's accounts. When a payee accepts a check without knowledge or notice that the check was issued by defalcating employees, the payee may not be liable if it is a holder in due course. Liability is premised on the payee's knowledge of the defalcation or breaches of fiduciary duty. *See* U.C.C. § 3–302 cmt. 4, case ex. 3; U.C.C. §§ 3–306, –307; A.R.S. §§ 47–3302 (2005), –3306 (2005), and –3307. Given Koss's allegation that Appellees knew of the defalcations and accepted the funds to pay off Sachdeva's account, a determination of Appellees' status as a holder in due course or whether they had knowledge or notice of the defalcations and breaches of fiduciary duty must await either summary judgment or trial. *See Prestige*, 916 N.E.2d at 1018,

1027 (affirming summary judgment for payee bank on acceptance of cashier's checks purchased by corporate employee to pay employee's account at bank because of lack of evidence of knowledge that employee had a fiduciary relationship with the plaintiff employer until after the last check had been negotiated or any evidence that if payee had contacted drawer bank it would have been informed not to cash checks); *see also Watson Coatings, Inc. v. Am. Express Travel Related Servs., Inc.*, 436 F.3d 1036, 1045 (8th Cir.2006) (affirming summary judgment on conversion claim dealing with checks and holding that while preemption did not apply, it was undisputed American Express did not know of the defalcations and thus was a holder in due course); *see also United Catholic Parish Schs. v. Card Servs. Ctr.*, 248 Wis.2d 463, 636 N.W.2d 206, 211–12 (App. 2001) (discussing notice).[22]

¶ 49 Appellees rely on *Burns v. Neiman Marcus Group, Inc.*, 173 Cal.App.4th 479, 93 Cal.Rptr.3d 130 (2009). In *Burns,* the plaintiff's employee either forged the plaintiff's signature on checks or used the checks which were to pay plaintiff's account at Neiman Marcus to pay her own account. *Id.* at 133. Plaintiff argued that given the large amounts of the checks, Neiman Marcus had a duty of inquiry to determine whether the checks were being used for a proper purpose. *Id.* at 134. The trial court dismissed the complaint and the Court of Appeal affirmed. *Id.* at 134–35. However, the court did not deal with U.C.C. preemption, but common-law duty issues. *Id.* at 135–40.

¶ 50 In conclusion, the superior court erred in holding Article 3 preempted Koss's claims based on the cashier's checks.

### III. Koss stated a common-law claim for conversion under Arizona law.[23]

¶ 51 The superior court also dismissed the common-law conversion claim

---

22. We assume without deciding that the holder in due course doctrine applies to cashier's checks.

23. Appellees did not brief below and have not briefed on appeal whether we should apply Wisconsin or Arizona law on the non-preemption issues except to say that neither Arizona nor Wisconsin recognizes a duty owed by them to Koss for purposes of the negligence claim, and that for the aiding and abetting liability claims, Wisconsin law should apply because Sachdeva's conduct occurred in Wisconsin. We will not

against American Express on the basis that a check is not property, but an obligation by the drawer, citing *Guardian Life Insurance Company of America v. Weisman*, 223 F.3d 229, 238 (3d Cir.2000). We disagree.

¶ 52 Conversion is the "act of wrongful dominion or control over personal property in denial of or inconsistent with the rights of another." *Case Corp. v. Gehrke*, 208 Ariz. 140, 143, ¶ 11, 91 P.3d 362, 365 (App.2004) (citation omitted). To maintain such an action, the plaintiff must have the right to immediate possession of the property at the time of the conversion. *Id.*

¶ 53 First, Arizona law recognizes that a party can bring a conversion action for converting the proceeds of a check. The first sentence of A.R.S. § 47–3420(A) expressly provides that "[t]he law applicable to conversion of personal property applies to instruments" which would include checks.[24]

¶ 54 Second, as we explained in *Autoville, Inc. v. Friedman*, 20 Ariz.App. 89, 91, 510 P.2d 400, 402 (1973), money can be the subject of a conversion action if the funds can be described, identified or segregated and there is an obligation to treat the funds in a specific manner. *See also Case*, 208 Ariz. at 145, ¶ 21, 91 P.3d at 367 (explaining that a conversion action for money deposited into an account could be brought when the money is deposited for a special purpose with notice to the bank); *Chicago Title Ins. Co. v. Ellis*, 409 N.J.Super. 444, 978 A.2d 281, 287–88 (N.J.Super.Ct.App.Div.2009) (holding that conversion action can be brought for return of fraudulently obtained funds, and limitations on conversion actions in the context of a debtor-creditor relationship between the plaintiff and defendant are imposed to avoid turning a contract dispute into a tort action). Here, of course, the conversion action is not based on a debtor-creditor relationship be-

tween Koss and American Express. As the court in *Chicago Title* pointed out, a conversion action can apply even to a third-party recipient of funds obtained for value who has knowledge of the fraudulent obtaining of the funds. *Id.* at 291–92.

¶ 55 Koss had a possessory interest in the funds represented by the cashier's checks and wire transfers, which American Express allegedly interfered with when it cashed the checks allegedly knowing of Sachdeva's fraud and used the proceeds of the cashier's checks and wire transfers to pay the merchants who had provided goods or services to Sachdeva charged on her American Express account. If it had knowledge that Sachdeva was embezzling funds from Koss to pay her American Express bills, it could be liable for conversion. The money was segregated and described by the amounts of the checks. *See Chicago Title*, 978 A.2d at 288 (stating that for funds to be identifiable, they do not need to be the identical bills or coin that belonged to the owner, but could be funds placed into an account).

¶ 56 We recognize that many courts reject a conversion action brought by a person authorizing the use of a check because it is merely paying an obligation it owes to the payee. *E.g.*, *Guardian Life Ins.*, 223 F.3d at 238; *Great Lakes Higher Educ. Corp. v. Austin Bank of Chicago*, 837 F.Supp. 892, 897–98 (N.D.Ill.1993). Arizona similarly rejects such a claim when the check or funds represent a debt owed by the plaintiff to the persons controlling the funds and the funds cannot be described, identified or segregated and there is no obligation to treat the funds in a specific matter. *Autoville*, 20 Ariz.App. at 91–92, 510 P.2d at 402–03. Here, however, there was no debt owed by Koss to American Express for which the checks were issued.

address the choice of law issue because it was not briefed on appeal. *Polanco v. Indus. Comm'n*, 214 Ariz. 489, 491 n. 2, ¶ 6, 154 P.3d 391, 393 n. 2 (App.2007). To the extent Appellees cite one unreported Wisconsin case in its answering brief as to the negligence claim, we will not address that case. *See* footnote 12 *supra*. For purposes of this decision, we assume Arizona law applies.

24. *See also* 2 James J. White & Robert S. Summers, Uniform Commercial Code Practitioner Treatise Series § 19–5, at 316 (hereinafter "White & Summers Vol. 2") (stating that in a case in which the drawer's employee authorized to write checks signs checks to pay his personal account, the U.C.C. invites the drawer to bring an action in conversion).

¶ 57 Cases from other jurisdictions also support our conclusion. For example, in *PWA Farms, Inc. v. N. Platte State Bank,* the court affirmed a judgment against a payee bank for conversion. 220 Neb. 516, 371 N.W.2d 102, 105 (1985). In *PWA,* the buyer of a farm had issued a check to the defendant bank to pay off the existing mortgage on the farm. *Id.* at 104. The bank, on the advice of the president of the current farm owner, applied the proceeds to pay off a personal debt of the president. *Id.* The corporate owner, as assignee of the buyer/drawer of the check, brought an action against the bank, including a claim for conversion. *Id.* The court affirmed the judgment for the plaintiff, holding that when a defendant bank receives a check made payable to it, even if the drawer does not give specific instructions on how to apply the funds, the bank has no right to disburse the funds to a stranger to the transaction. *Id.* at 105. In so holding, the court explained that a check could be the subject of a conversion action. *Id.; see Decatur Auto Ctr. v. Wachovia Bank, N.A.,* 276 Ga. 817, 583 S.E.2d 6 (2003); *Strickland v. Kafko Manufacturing, Inc.,* 512 So.2d 714 (Ala.1987); *see also Dayton Constr., Inc. v. Meinhardt,* 882 S.W.2d 206, 208–09 (Mo.Ct. App.1994) (affirming judgment for conversion against employee who embezzled checks made payable to his employer by depositing them into secret bank account under name of employer; court held that specific checks support a cause of action for conversion where they can be described or identified as a specific chattel).

¶ 58 American Express's reliance on several cases is misplaced because in each case the action brought by the drawer was to pay its debt to the payee, *Guardian Life Insurance,* 223 F.3d at 238, the drawer had taken no steps to retain a possessory interest in the funds, *Universal Marketing & Entertainment, Incorporated v. Bank One of Ariz., N.A.,* 203 Ariz. 266, 267–68, ¶¶ 4, 7, 53 P.3d 191, 192–93 (App.2002), or the issue of un-segregated funds was not preserved in the trial court, *T.W.S., Incorporated v. Nelson,* 150 Wis.2d 251, 440 N.W.2d 833, 835 n. 3 (App.1989). Here, as discussed above, we assume the funds were segregated to Sachdeva's American Express account and a transfer to American Express's general account could not unilaterally destroy Koss's interest in the funds.

## IV. Koss failed to state a claim for negligence.

 ¶ 59 The superior court dismissed Koss's negligence count holding that Koss failed to provide any binding authority that the defendants owed it a duty. In part, the court held that Koss alleged in its complaint that it was not asserting claims as a customer of American Express but argued it was a customer for purposes of a duty and Koss could not have it both ways. We agree that Koss has failed to state a claim for negligence under Arizona law.

¶ 60 In its negligence count, Koss alleged Appellees were liable in negligence for failing to properly maintain a program to detect and report suspicious activities of financial crimes, failing to follow their own policies regarding such a program, failing to timely disclose Sachdeva's embezzlement, and accepting and posting Sachdeva's payments when they knew of Sachdeva's embezzlement of Koss funds to pay her American Express bills. Koss alleged Appellees had a duty to Koss to undertake such conduct both under the U.C.C. (including A.R.S. §§ 47–3103 and –3406 (2005)) and by voluntarily undertaking such a program.[25]

¶ 61 On appeal, Koss argues Appellees owed it a duty to properly discover Sachdeva's embezzlement and report it to Koss because: (1) Appellees had voluntarily undertaken a duty to discover fraud; (2) Such a duty arose because Koss was an American Express customer; and (3) Arizona's statute

---

**25.** Koss alleged a statutory duty to properly discover and report the defalcations under the U.C.C. and under federal law dealing with bank secrecy and money laundering. We do not address that claim because Koss did not argue those statutory duties in its response to the mo-

tion to dismiss or in its opening brief on appeal. *Polanco,* 214 Ariz. at 491 n. 2, ¶ 6, 154 P.3d at 393 n. 2; *Paloma Inv. Ltd. P'ship v. Jenkins,* 194 Ariz. 133, 137, ¶ 17, 978 P.2d 110, 114 (App. 1998).

criminalizing theft, A.R.S. § 13–1802(A)(5) (Supp.2012), created such a duty.

¶ 62 To state a claim for negligence, a plaintiff must show among other elements that the defendant owed it a duty requiring the defendant to conform to a certain standard of conduct. *Gipson v. Kasey,* 214 Ariz. 141, 143, ¶ 9, 150 P.3d 228, 230 (2007). The determination of whether a defendant owes a plaintiff a duty of due care is determined by the court as a matter of law, *id.,* disregarding any foreseeability that breach of that duty would cause harm to the plaintiff, *id.* at 144, ¶¶ 14–17, 150 P.3d at 231. Instead, the duty must be based on the relationships between the parties, *id.* at 145, ¶ 19, 150 P.3d at 232, or public policy, *id.* at ¶ 23.[26] While no special or direct relationship is required, duties of care based on relationship can be based on contract, family relationships or conduct undertaken by the defendant. *Id.* at SI 18. Public policy creating a duty can arise from a statute prohibiting conduct if the statute is designed to protect the class of persons in which the plaintiff is included against the risk of the type of harm which in fact occurs as a result of the violation. *Id.* at 146, ¶¶ 24–26, 150 P.3d at 233.

¶ 63 In *Kesselman v. National Bank of Arizona,* we held that a bank has no duty for purposes of a negligence claim to report alleged defalcations or check kiting by one of its customers to a third party which was not a customer of the bank even if the bank was aware that the misconduct might harm the third party. 188 Ariz. 419, 421–23, 937 P.2d 341, 343–45 (App.1996). We explained that in some cases, a duty to disclose might arise if there was a previous definite fiduciary relationship between the bank and the third party, one or each of the parties to the contract expressly reposed trust and confidence in the other, or where the contract or transaction is intrinsically fiduciary and calls for perfect good faith. *Id.* at 422, 937 P.2d at 344. Even under one of those exceptions, special circumstances would have to arise to overcome the interest of client confidentiality including that the bank had actual knowledge that its customer committed fraud, in which case it must disclose financial information. *Id.* However, we further clarified the actual knowledge condition is premised on some relationship between the bank and the third party involving the transactions at issue. *Id.* at 423, 937 P.2d at 345. Accordingly, we held that National Bank of Arizona had no duty to disclose the alleged check kiting of its customer, a title insurance company, even though it knew of the misconduct and knew the title company was acting as an escrow company and had a fiduciary relationship with others. *Id.* at 424, 937 P.2d at 346. As we further explained, requiring such a disclosure duty to third parties would place a heavy duty on a bank. *Id.* Koss's remedy is not in negligence, but in the intentional torts it has alleged. *See Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund,* 201 Ariz. 474, 485, ¶¶ 31–36, 38 P.3d 12, 23 (2002).

¶ 64 We see no reason to distinguish between a bank and a credit card company such as American Express for these disclosure purposes. Credit card customers should be able to consider their accounts as confidential. Such confidentiality would be threatened if a credit card company, on a mere suspicion of misconduct by its card holder, had a duty to disclose any possible misconduct to third parties simply to avoid potential liability to those third parties. A credit card company, like a "bank cannot know the details of its customers' transactions. What appears suspicious may in fact be proper." *Kesselman,* 188 Ariz. at 424, 937 P.2d at 346. This is especially true given the large number of transactions a credit card issuer processes.[27]

---

**26.** Arizona has not categorically rejected the view that the duty of care is more general and that absent certain other factors, every person is under a duty to avoid creating situations which pose an unreasonable risk of harm to others. *Gipson,* 214 Ariz. at 146 n. 4, ¶ 24, 150 P.3d at 233 n. 4; *see also id.* at 147–48, ¶¶ 35–40, 150 P.3d at 234–35 (Hurwitz, J., concurring). However, Koss has not argued for such a general duty of care and we therefore will not address it. *Id.* at 148, ¶ 41, 150 P.3d at 235 (Hurwitz, J., concurring).

**27.** Appellees rely on *Burns,* in which the court held that a retailer has no duty to report defalcations of the customer's funds by a customer's employee to pay the employee's personal credit card bills at the retailer. 93 Cal.Rptr.3d at 137–

¶ 65 Our conclusion, however, does not ignore that a bank or credit card company cannot simply ignore defalcations about which it is allegedly aware. In those cases, the bank or credit card company may be liable for aiding and abetting the fraud or breach of fiduciary duty by its customer without any duty of disclosure to the victim of the misconduct because aiding and abetting is an intentional tort. *Wells Fargo*, 201 Ariz. at 483–85, ¶¶ 18–30, 38 P.3d at 21–23. Koss has adequately alleged just such a claim under *Wells Fargo*. *See id.* at 485, ¶¶ 31–34, 38 P.3d at 23.[28]

¶ 66 Koss attempts to preserve its negligence claim by arguing that Appellees voluntarily undertook a duty to monitor for alleged fraud, had a duty to their customers under *Wells Fargo*, and had a duty to disclose under Arizona criminal statutes. We disagree. First, regardless of whether Appellees had undertaken a duty to monitor for fraud, that is not the crux of the negligence claim. Rather, as Koss concedes, it was the failure to disclose the alleged fraud which would cause any liability. If Appellees had

no duty to disclose, the fact they uncovered fraud is irrelevant for purposes of Koss's negligence claim.[29]

¶ 67 Second, as we discuss above, under *Kesselman*, the relationship between the plaintiff and the bank to create a duty to disclose must involve a contractual relationship based on the conduct creating liability. Whether Koss had its own American Express cards or an account with American Express is irrelevant for the duty analysis because those accounts were not directly involved in Sachdeva's transactions with American Express and her defalcations.

¶ 68 Finally, as our supreme court has recognized, "existence of a statute criminalizing conduct is one aspect of Arizona law supporting the recognition of [a] duty." *Gipson*, 214 Ariz. at 146, ¶ 25, 150 P.3d at 233 (citation omitted). However, it has cautioned that criminal statutes will create duties in tort only if the statute is "designed to protect the class of persons, in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its

---

28. In the answering brief, Appellees argue that the complaint does not sufficiently allege a claim for aiding and abetting Sachdeva's misconduct and argues that since Sachdeva's conduct occurred in Wisconsin, Wisconsin law should apply. Not only did Appellees not raise this argument below, but the facts alleged in the complaint fall squarely within the elements of an aiding and abetting claim under *Wells Fargo*. *See Wells Fargo*, 201 Ariz. at 485, ¶ 34, 38 P.3d at 23 (listing elements for aiding and abetting as: (1) the primary tortfeasor must commit a tort that causes injury to the plaintiff; (2) the defendant knew that the primary tortfeasor's conduct was a breach of duty; and (3) the defendant must substantially assist or encourage the primary tortfeasor in the achievement of the breach). The fact that Sachdeva's misconduct occurred in Wisconsin is of no moment because Appellees' alleged misconduct occurred in Arizona.

29. Koss also relies on *Stanley v. McCarver*, 208 Ariz. 219, 92 P.3d 849 (2004), to argue that a pre-existing or direct relationship is unnecessary to create a duty on defendants to disclose any

38. While the California Court of Appeal held that no such duty existed, it did so in part based on foreseeability of harm. *Id.* Arizona has rejected foreseeability as a factor in determining duty. *Gipson*, 214 Ariz. at 143–44, ¶¶ 9, 14–17, 150 P.3d at 230–231.

fraud they found. Rather, by agreeing to voluntarily monitor accounts for suspicious activities, Koss claims defendants must perform such duty properly and may be liable for negligent performance. We disagree. In *Stanley*, our supreme court held that a physician hired by a potential employer to physically examine a potential employee undertook a professional obligation with respect to the patient's health and having placed himself in that situation, he should have anticipated the patient would want to know of any life-threatening condition. 208 Ariz. at 223, ¶ 13, 92 P.3d at 853. In part, the court relied upon Restatement (Second) of Torts § 324A (1965), which suggests imposing a duty on a person who undertakes to render services to another which he should recognize as necessary for the protection of a third person and is liable to the third person if his failure to exercise reasonable care increases the risk of harm or harm is suffered because of the third person's reliance on the undertaking. *Id.* at 223–24, ¶ 15, 92 P.3d at 853–54. Appellees did not undertake any duty to render services to Koss regarding Sachdeva, and Koss did not enter into any agreement with Appellees to have them render such services. Moreover, as we explained in *Lloyd v. State Farm Mutual Automobile Insurance Company*, 176 Ariz. 247, 251, 860 P.2d 1300, 1304 (App.1992), any potential liability is based on reliance placed by the plaintiff on the defendant protecting its interests. Koss has not alleged any such reliance here.

violation." *Id.* (citations omitted). Thus, in *Gipson,* the defendant had given prescription drugs to a second person and knew she would probably give the drugs to her boyfriend. *Id.* at 143, ¶ 5, 150 P.3d at 230. She passed the drugs on and the boyfriend died. *Id.* at 143, ¶ 6, 150 P.3d at 230. The court relied on Arizona statutes criminalizing distribution of prescription drugs to persons lacking a valid prescription. *Id.* at 146, ¶ 26, 150 P.3d at 233.

¶ 69 This case does not fall within the *Gipson* paradigm. In *Gipson,* the defendant had violated the criminal statute in passing the drugs to another. Here, Appellees did not steal funds from Koss, Sachdeva did. The harm which the theft statutes try to prevent is the theft of funds or property, not a third person receiving funds from the thief to pay the thief's balance legitimately owed to a creditor, even if the creditor may know the funds had been stolen. Creating a duty from Appellees to Koss sounding in negligence because Sachdeva might have been guilty of theft is inappropriate. Koss's remedy lies in either aiding or abetting Sachdeva's misconduct or conversion.

## CONCLUSION

¶ 70 For the reasons stated above, we reverse the judgment of the superior court to the extent it dismissed the aiding and abetting and conversion claims based on the wire transfers and cashier's checks, but affirm its dismissal of Koss's negligence claim. We remand this matter for further proceedings consistent with this opinion.

CONCURRING: PATRICIA K. NORRIS, Presiding Judge, and JOHN C. GEMMILL, Judge.